Hillsborough
No. 84-241

FRANK ROBERTS AND PATRICIA ROBERTS

v.

RUSSELL WARD AND GAIL WARD

April 18, 1985

*Weston & Printzlau P.C.*, of Londonderry (*Jay E. Printzlau* on the brief and orally), for the plaintiffs.

*James J. Fleming*, of Londonderry, by brief and orally, for the defendants.

DOUGLAS, J. The issue presented by this appeal is whether a petition by grandparents seeking visitation rights with their grandchild, outside the marital dissolution context provided for by statute, states a cause of action over which the superior court has jurisdiction. We reverse the superior court's dismissal of the petition, and remand.

On March 19, 1984, Frank and Patricia Roberts petitioned for defined and regular rights of visitation with their grandchild, Trisha Ann Doe, as consistent with the best interests of that child.

In their petition the Robertses alleged that they are the natural maternal grandparents of the child. The mother of the child, their daughter, who is the defendant Gail Ward, had the child out of wedlock. The identity and whereabouts of the child's natural father have never been known to the Robertses. The child and her mother lived with the Robertses in the plaintiffs' home for a year and a half after the child's birth on April 10, 1974. This living arrangement was terminated by Mrs. Ward, following the plaintiffs' objections to their daughter's erratic behavior. The plaintiffs nonetheless maintained regular contact with their grandchild. They cared for her nearly every weekend from 1976 to 1979. They also picked her up from day care and provided her evening meal every day during that period while, they contend, their daughter worked and experimented with various life styles and male companions. From the fall

of 1979, when the child began formal schooling, until 1983, the plaintiffs and child visited nearly every weekend.

At some point, Gail Ward married the defendant Russell Ward, the child's stepfather. The Robertses allege that he has used excessive corporal punishment on the child. They further state that the child has had no less than ten homes and five schools in her ten years.

The Wards severely restricted the plaintiffs' contact with their grandchild beginning in 1983, and have recently denied the Robertses any personal contact with her at all. The plaintiffs assert that they have been the single stabilizing factor in the child's life, that the child strongly desires visitation with her grandparents and that it would be in the best interest of the child for the court to order such visitation.

The Superior Court (*Dalianis*, J.) dismissed the petition for want of jurisdiction. As the basis for its dismissal, the court stated that its power to award custody and visitation is wholly statutory and not based on independent equitable powers. The court held that the only statutory provision for grandparental visitation was contained in RSA 458:17, VI, dealing with marital dissolution situations. Since the plaintiffs did not petition pursuant to that statute, they did not state a claim upon which judgment could be made.

As the basis for its ruling, the court cited *Stetson v. Stetson*, 103 N.H. 290, 171 A.2d 28 (1961). That case held that "the power of the Superior Court to award custody of minor children and to make provisions for the support of the wife and the children is wholly statutory, and that the court has no independent equity jurisdiction." *Id.* at 291, 171 A.2d at 29.

While, on its face, this language denies jurisdiction to entertain any child custody/visitation matters falling outside RSA chapter 458, the divorce, annulment, and separation statute, consideration of the context of this quote, as well as the cases relied upon in *Stetson*, indicates that such a result is not always warranted.

*Stetson* itself was a divorce case in which the husband challenged the jurisdiction of the court to order support payments where the divorce is denied or the proceedings temporarily halted. Citing two sections of RSA chapter 458, this court held that the statute did give the superior court power to order support under such circumstances.

All three cases cited by *Stetson* for the proposition that the jurisdiction of the court regarding custody and support are statutorily derived, were also divorce proceedings. Those cases made it clear, however, that their holdings regarding jurisdiction were confined to the marital dissolution context: "'The power of the court *in divorce proceedings* as to alimony, custody and support of children is wholly

statutory.'" *Kennard v. Kennard*, 81 N.H. 509, 514, 129 A. 725, 728 (1925) (quoting *Salta v. Salta*, 80 N.H. 218, 219, 116 A. 438, 439 (1921)) (emphasis added); "The Superior Court *sitting as a divorce court* has no independent equity jurisdiction over allowances for support of minor children." *Guggenheimer v. Guggenheimer*, 99 N.H. 399, 401, 112 A.2d 61, 63 (1955) (emphasis added).

██ This line of cases stands for the proposition that when the superior court has jurisdiction over a case by virtue of RSA chapter 458, it has only the power conferred upon it by that statute. *Stetson* and the cases it relies upon, therefore, do not preclude the superior court from ever entertaining any custody or visitation matters outside of the divorce context, as the order of the lower court in this case suggests. *See Locke v. Ladd*, 119 N.H. 136, 399 A.2d 962 (1979).

Although these cases do not preclude the superior court from hearing custody and visitation matters outside the divorce context, the extent of the superior court's ability to do so has never been decided. Whether the equitable powers of the court allow it to entertain grandparental visitation requests over the objections of the natural parent is the issue before us today.

██ This court has recognized that "[t]he family and the rights of parents over it are . . . natural, essential, and inherent rights within the meaning of the New Hampshire Constitution . . . ." *State v. Robert H._____*, 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978). Because of their fundamental importance, great judicial deference has been accorded parental rights. They have been found to operate against the State (*Santosky v. Kramer*, 455 U.S. 745 (1982)), against third parties (*Caban v. Mohammed*, 441 U.S. 380 (1979)), and against the child (*Moe v. Dinkins*, 669 F.2d 67 (2d Cir.), *cert. denied*, 459 U.S. 827 (1982)).

Parental autonomy is grounded in the assumption that natural parents raise their own children in nuclear families, consisting of a married couple and their children. The family has been seen as the "basic building block" of society. Parental autonomy strengthens the family and the entire social fabric "by encouraging parents to raise their children in the best way they can by making them secure in the knowledge that neither the state nor outside individuals may ordinarily intervene." Bartlett, *Rethinking Parenthood as an Exclusive Status: The Need For Legal Alternatives When the Premise of the Nuclear Family Has Failed*, 70 VA. LAW REV. 879, 879–80, 887–90 (1984) (hereinafter cited as *Rethinking Exclusive Parenthood*).

The realities of modern living, however, demonstrate that the validity of according almost absolute judicial deference to parental rights has become less compelling as the foundation upon which

they are premised, the traditional nuclear family, has eroded. In 1982, it was estimated that 25% of the children in this country did not live with both natural parents and that this figure will rise to 40% by 1990. *Rethinking Exclusive Parenthood*, at 880–81. More varied and complicated family situations arise as divorces, and decisions not to marry, result in single-parent families; as remarriages create step-families; as some parents abandon their children; as others give them to temporary caretakers; and as still others are judged unfit to raise their own children.

One of the frequent consequences, for children, of the decline of the traditional nuclear family is the formation of close personal attachments between them and adults outside of their immediate families. Stepparents, foster parents, grandparents and other caretakers often form close bonds and, in effect, become psychological parents to children whose nuclear families are not intact. *Rethinking Exclusive Parenthood*, at 881.

It would be shortsighted indeed, for this court not to recognize the realities and complexities of modern family life, by holding today that a child has no rights, over the objection of a parent, to maintain a close extra-parental relationship which has formed in the absence of a nuclear family. It makes little sense to consider the child's interest by according grandparents visitation rights under RSA 458:17, VI when a two-parent family dissolves, but to withhold such rights in a case, such as the one before us, where a traditional two-parent family has never existed.

▮ Further, it would be incongruous to deny courts the ability even to consider the effects upon children of denial of visitation rights under these circumstances, when we have made the best interests of the child the beacon by which to guide all custody matters. *Del Pozzo v. Del Pozzo*, 113 N.H. 436, 309 A.2d 151 (1973). Rather, the better view is that the superior court, as an instrumentality of the State, may use its *parens patriae* power to decide whether the welfare of the child warrants court-ordered visitation with grandparents to whom close personal attachments have been made.

Utilizing its *parens patriae* power to permit grandparental visitation when it is in the best interest of the child, in situations where RSA 458:17, VI is not applicable, furthers the policy underlying that statute: ensuring the continuity of relationships between children and their grandparents. C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE: FAMILY LAW § 242 (1982). The importance to children of stability and continuity in their close relationships is well recognized. "Psychiatrists and psychologists . . . unanimously counsel that children should maintain and retain meaningful relationships and that

to deny them continuing contacts is a deprivation . . . . Stability, continuity, and opportunity, of and for meaningful associations are said to build a healthy psyche." Foster and Freed, *The Child's Right to Visit Grandparents*, TRIAL, March 1984, at 38 (hereinafter cited as *The Child's Right*).

The relationships between children and their grandparents are often particularly special, close, and rewarding:

> "It is a biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship."

*Mimkon v. Ford*, 66 N.J. 426, 437, 332 A.2d 199, 204–05 (1975).

In determining whether or not to grant grandparental visitation, the court must consider the best interests of the child. In doing so, it recognizes that it is primarily "the right of the child to . . . know her grandparents" which is being protected and not the interests of the grandparents. *Lucchesi v. Lucchesi*, 71 N.E.2d 920, 922 (Ill. App. 1947).

Moreover, in balancing the child's rights to know and associate with her grandparents against the parent's right to custodial autonomy, we note that we are dealing here only with visitation rights. "[G]ranting visitation is a far lesser intrusion, or assertion of control, than is an award of custody" and thus not nearly as invasive of parents' rights. *Krieg v. Glassburn*, 419 N.E.2d 1015, 1019 (Ind. App. 1981). *See also Locke v. Ladd*, 119 N.H. 136, 140, 399 A.2d 962, 965 (1979).

Our holding today is in accord with the position taken by a number of other jurisdictions, which have found non-statutory bases for granting grandparents visitation rights. *See, e.g., Mirto v. Bodine*, 294 A.2d 336, 337 (Conn. Super. Ct. 1972) (best interests of the child); *Anonymous v. Anonymous*, 269 N.Y.S.2d 500, 503 (1966) (broad equitable powers of the court); *Hawkins v. Hawkins*, 102 Ill.

App. 3d 1037, 1039, 430 N.E.2d 652, 653 (1981) (common law); *Krieg v. Glassburn*, 419 N.E.2d 1015, 1019 (Ind. App. 1981) (best interest of the child). *But see Olds v. Olds*, 356 N.W.2d 571 (Iowa 1984); *In re Visitation of J. O.*, 441 N.E.2d 991 (Ind. App. 1982).

 Factors which the court may consider in determining whether or not to grant grandparental visitation include: whether the child has lived with the grandparents and the length of that residence; whether the grandparents have stood *in loco parentis* to the child; the effect on the child's physical and emotional health engendered by visitation or lack of it; the circumstances which resulted in the absence of a nuclear family; and the child's preference regarding visitation. *See The Child's Right*, at 40–45; Allen, *Visitation Rights of a Grandparent over the Objection of a Parent: The Best Interests of the Child*, 15 J. FAM. L. 51, 59–73 (1976–77), *and cases cited therein.* The fact that there is friction between the parents and grandparents will not in and of itself preclude granting visitation rights but may be considered among all the surrounding circumstances.

 For all the foregoing reasons, we hold that, where a meaningful relationship has formed in the absence of a traditional nuclear family, a grandparent may petition for visitation rights, and the superior court will determine whether it is in the best interest of the child to grant such visitation. We therefore remand the case for a determination of the child's rights consistent with this opinion.

*Remanded.*

All concurred.