Strafford
No. 89-186

MARIE ROSE PRESTON

v.

LORRAINE PRESTON MERCIERI

April 11, 1990

*Fisher, Willoughby, Clancy, Woodman & Durand,* of Dover (*Edward T. Clancy* on the brief and orally), for the plaintiff.

*Coolidge Professional Association*, of Somersworth (*Clyde R. Coolidge* on the brief and orally), for the defendant.

BROCK, C.J.   This case requires us to consider the availability of court-ordered grandparent visitation, and to determine, for the first time, whether the adoption of a child by a stepparent, which automatically extinguishes the rights of a natural parent, also divests the court-decreed visitation rights of grandparents on that side. The defendant, Lorraine Preston Mercieri, appeals from an order of the Superior Court (*Nadeau*, J.) denying her motion to terminate visitation privileges previously awarded to the plaintiff. For the reasons that follow, we affirm.

The plaintiff, Marie Rose Preston, is the paternal grandmother of Ricky A. Preston, Jr., who was the only child born to her son, Ricky A. Preston, Sr., now deceased, during his marriage to the defendant, Lorraine Preston Mercieri. When the child was four years old, his father separated from the defendant and left the family home, filing for divorce on February 13, 1985, before he died suddenly on June 25, 1985. During the pendency of the divorce proceedings, and until his accidental death, Ricky A. Preston, Sr., resided with his mother, the plaintiff, and as a result, young Ricky visited his grandmother every weekend.

Tragically, however, the child suffered the separation of his parents, and the death of his father, only to become the subject of a bitter war between his mother and his grandmother. The child's dev-

astating loss of his father was compounded, in a sense, by the loss of his grandmother, because the defendant refused, after her husband's death, to allow any further visitation between the plaintiff and her grandson. Not prepared to be easily shut-out, the plaintiff filed a petition in the superior court seeking formalized visitation rights, and on June 3, 1986, the court granted the requested rights, reasoning that the plaintiff had considerable love for her grandchild, and he for her, and that the grandmother was entitled to visits because it was "in the best interest of the child that they occur."

Noting the child's continued problems with nightmares and stutters, which developed during his parents' divorce action and worsened after his father's death, the court recognized the heart-wrenching effect upon the child of his family's intense hostility, and the emotional deficits suffered by the child as a result of the sudden cleavage of his family bonds. Because the parties could not agree upon the specifics of what constituted reasonable rights of visitation, and in particular, whether the plaintiff was permitted to have her grandchild stay overnight, the court clarified that reasonable visitation included occasional overnights and weekends at her beach cottage in the summer. The defendant then appealed to this court, thereby creating another link in the lengthy procedural lineage of this case, and a pre-hearing evaluation was conducted, at which time the parties agreed to settle the matter, filing stipulations that were eventually approved by the superior court.

In the meantime, however, the defendant's present husband, David Mercieri, initiated adoption proceedings in the probate court, accomplishing the adoption in the fall of 1988, without reference to the pending litigation and without notice to the plaintiff. By letter dated November 11, 1988, the defendant's counsel unilaterally proclaimed the court order of visitation "null and void," advising the plaintiff's counsel that "Ricky has been adopted . . . and thus your clients are no longer his legal grandparents." Seeking recourse, once again, through the superior court, the plaintiff filed a motion to enforce the stipulations, and the defendant, in turn, filed a motion to terminate further visitation. The court held that the plaintiff's entitlement to visit her grandchild survived the stepparent adoption, and ordered all parties to comply with the stipulation previously approved, warning the defendant that the court would not hesitate to exercise its authority, as justice required, if she interfered either directly or indirectly with the grandmother's exercise of her visitation rights. This appeal followed.

Pointing to RSA 170-B:20, the New Hampshire adoption statute, the mother claims that the New Hampshire adoption scheme severed her child, at law, from the family tree of his biological father, now deceased, and substituted a new father, David Mercieri, together with his lineal relationships, so that the child acquired the status of a natural son in respect to his stepfather and became a stranger to the blood-line of his natural father, thereby extinguishing the plaintiff's visitation rights and leaving the question of grandparental contacts solely to the defendant's own discretion and that of the adoptive father, just as it would be if the child had remained in the care and custody of his married biological parents. We disagree.

In most families blessed with a new generation of issue, the door to the young ones is unguarded and safe; grandparents do not watch to invade another's right or guard their own. But for grandparents cast-out from their grandchild's world, the closing door invites inquiry as to what effect, if any, visitation has upon the child's welfare. When grandparents have cherished a child since its birth, holding it, prattling, on their knees, sharing its moments of gladness and comforting it in hours of distress, the child's love and returned affection beget instinctive feelings of filial attachment and right.

At common law, however, the parental obligation to allow visitation was considered "moral, and not legal." *Mimkon v. Ford*, 66 N.J. 426, 431, 332 A.2d 199, 201 (1975) (quoting *Succession of Reiss*, 46 La. Ann. 347, 353, 15 So. 151, 152 (1894)). Thus, at common law, ascendants were bound to grandchildren only by the links of love and heredity, and neither generation could be heard to complain if, by sudden wrench, they were forced apart. Although courts sympathized with the plight of grandparents when, by reason of parental indifference or intolerance, access to a grandchild was denied, parental authority was generally deemed supreme with regard to the upbringing of offspring, and courts refused to interfere with child-rearing decisions that excluded grandparents and prohibited meaningful contact with grandchildren. *See, e.g., Kanvick v. Reilly*, 760 P.2d 743, 745 (Mont. 1988) (under common law, grandparents had no right to visit grandchildren); *In re Whitaker*, 36 Ohio St. 3d 213, 214, 522 N.E.2d 563, 565 (1988) (at common law, grandparents had no legal right of access to grandchildren); *In re Marriage of Herreras*, 159 Ariz. 511, 512, 768 P.2d 673, 674 (1989) (grandparents had no legal right of visitation at common law); *Clark v. Evans*, 778 S.W.2d 446, 448 (Tenn. App. 1989) (at common law grandparents had no legal right to visit grandchildren).

■ Guarding against the State's encroachment upon parental rights, the Supreme Court of the United States has recognized a private realm of family life which the State cannot enter. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The judicial reluctance to interfere with parental prerogatives derives, historically, from the notion that parents have a natural entitlement to the exclusive "companionship, care, custody, and management" of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Adhering to this tradition of family autonomy, the Supreme Court has consistently emphasized the right of parents to raise their children in accordance with their own philosophies and beliefs, however at odds with the average, and has sustained the parenting right, like the right to marry and establish a home, as a fundamental liberty interest protected by the fourteenth amendment. *Griswold v. Connecticut*, 381 U.S. 479, 488 (1965) (Goldberg, J., concurring) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). In New Hampshire, the rights of parents over the family are considered "natural, essential and inherent rights within the meaning of the New Hampshire Constitution, part I, article 2." *In re Diana P.*, 120 N.H. 791, 798, 424 A.2d 178, 182 (1980), *cert. denied*, 452 U.S. 964 (1981); *State v. Robert H.* —, 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978). Thus, parents enjoy a constitutionally protected right to raise their children as they see fit, unfettered by undue State intrusion.

■■ But, while the common law has long acknowledged that parental rights are "essential to the orderly pursuit of happiness by free men," *Meyer v. Nebraska supra*, and more significant and priceless than "'liberties which derive merely from shifting economic arrangements,'" *Stanley v. Illinois supra* (quoting *Kovacs v. Cooper*, 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring)), the parental interest in raising children without State intervention is not without limitation. Rather, the parental right of family autonomy is subject to a corresponding duty on the part of parents to adequately care for their children, and child-rearing rights are secured by the law only to the extent that parents discharge their obligation. *See Purinton v. Jamrock*, 195 Mass. 187, 201, 80 N.E.2d 802, 805 (1907). The State has a competing interest in the welfare of children within its jurisdiction, and may, as *parens patriae*, intervene in the family milieu if a child's welfare is at stake. *Prince v. Massachusetts supra*. Accordingly, parental rights are not absolute, but are subordinate to the State's *parens patriae* power, and must yield to the welfare of the child.

Because the common law presumption against intervention was premised upon the tradition of nuclear family autonomy, State intervention turned, historically, on whether or not the parents were unfit, *see Quilloin v. Walcott*, 434 U.S. 246, 248 (1978), or the family was "intact." *See* Note, *Visitation After Adoption: In the Best Interests of the Child*, 59 N.Y.U.L. REV. 633, 651 (1984). When a child was living in the care and custody of his married, biological parents, courts were virtually unanimous in denying grandparents visitation privileges, and hence, grandparents had no judicially acknowledged right of access. *See Mimkon v. Ford*, 66 N.J. at 430, 332 A.2d at 201 (collecting cases that denied visitation in pre-statutory era). Recognizing, however, that the premise of nuclear family autonomy fails when the natural family is disrupted, many jurisdictions have enacted statutes providing grandparents with legal recourse when, by reason of either death or divorce, one of the natural parents becomes legally absent and can no longer ensure continued contact with grandchildren. *See, e.g.*, ALASKA STAT. § 25.24.150 (1987); ARIZ. REV. STAT. ANN. § 25-337.01 (Supp. 1989); CAL. CIV. CODE § 197.5 (1971); COLO. REV. STAT. § 19-1-117 (Supp. 1989); GA. CODE ANN. § 19-7-3 (Supp. 1988); IND. CODE ANN. § 31-1-11.7-2 (Supp. 1989); LA. REV. STAT. ANN. § 9:572 (West Supp. 1989); MASS. GEN. LAWS ANN. c. 119, § 39D (West Supp. 1989); MICH. COMP. LAWS ANN. § 722.27(b) (West Supp. 1989); MO. ANN. STAT. § 452-402 (Supp. 1989); N.J. STAT. ANN. § 9:2-7.1 (West Supp. 1989); S.D. CODIFIED LAWS ANN. § 25-4-53 (1984); W. VA. CODE §§ 48-2B-1, 48-2-15(b)(1) (1986); WYO. STAT. § 20-2-113(c) (1987).

Declining to confine court-ordered visitation to the dissolution or death context, other jurisdictions have statutorily expanded the category of grandparents who may petition for visitation, authorizing visitation when parental rights are terminated, *see* MISS. CODE ANN. §§ 93-16-3, 93-16-7 (Supp. 1989); NEV. REV. STAT. 125A.330 (1990); OKLA. STAT. ANN. Tit. 10, § 5 (West Supp. 1986); or when the parents have returned with their child to the grandparental nest, and the grandchild has lived with the grandparents for an extended period of time, *see* MINN. STAT. 257.022 (1988); N.M. STAT. ANN. §§ 40-9-1, 40-9-2 (1987); PA. STAT. ANN. Tit. 21-23, §§ 5311–5314 (West Supp. 1989). Still other jurisdictions grant standing to petition if the child is not, for other reasons, living in an intact natural family. *See* IOWA CODE ANN. § 598.35 (1989) (if child born out of wedlock or residing in foster home); FLA. STAT. 752.01 (1989) (if parent has deserted child);

TEX. FAM. CODE ANN. § 14.03 (1986) (if parent is in jail or child has been neglected or abused).

Moreover, at least twenty jurisdictions have open-ended statutes permitting any grandparent to petition for visitation, irrespective of the child's custodial status. *See, e.g.,* ALA. CODE § 30-3-4 (Supp. 1989); ARK. STAT. ANN. § 9-13-103 (1987); CONN. GEN. STAT. § 46b-59 (1983); HAW. REV. STAT. § 571-46(7) (Supp. 1989); IDAHO CODE § 32-1008 (1983); KAN. STAT. ANN. § 38-129 (1986); KY. REV. STAT. ANN. § 405.021 (1984); ME. REV. STAT. ANN. Tit. 19, § 752(6) (Supp. 1989); MONT. CODE ANN. § 40-9-102 (1989); NEB. REV. STAT. 43-1802 (1988); N.Y. DOM. REL. LAW § 72 (Supp. 1990); N.C. GEN. STAT. § 50-13.2(b1) (1989); N.D. CENT. CODE § 14-09-05.1 (Supp. 1989); R.I. GEN. LAWS § 15-5-24.3 (Supp. 1988); S.C. CODE ANN. § 20-7-420 (Supp. 1989); TENN. CODE ANN. § 36-6-301 (1984); UTAH CODE ANN. § 30-5-2 (1989); VT. STAT. ANN. Tit. 15 §§ 1011–1016 (Supp. 1987); WASH. REV. CODE ANN. § 26.09.240 (1989); WIS. STAT. ANN. 767.245 (1988).

■ Despite the recent proliferation of visitation statutes that either explicitly or implicitly grant standing for the parents of a deceased child to petition for visitation of grandchildren, New Hampshire's first legislation on the subject, effective at the time of the hearing in the superior court, and on appeal, addressed visitation only in the context of a divorce. *Compare* RSA 458:17, VI *with* RSA 458:17-d (Supp. 1989) (newly enacted legislation, effective January 1, 1990, spells out a variety of family situations in which grandparents may petition for visitation). In New Hampshire, however, visitation rights have been judicially enlarged to include grandparents outside of the statutory category of RSA 458:17, VI. *Roberts v. Ward,* 126 N.H. 388, 493 A.2d 478 (1985); C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE, FAMILY LAW § 242, at 225 (1982 and Supp. 1989). Reasoning that "we have made the best interests of the child the beacon by which to guide all custody matters," this court has held that the superior court may utilize its *"parens patriae* power to permit grandparental visitation when it is in the best interests of the child, in situations where RSA 458:17, VI is not applicable." *Id.* at 392, 493 A.2d at 482. Thus, in New Hampshire the justification for granting visitation does not depend upon notions of bloodlines or kinship; rather, it is primarily the interests of the child which are protected and not the right of the grandparent. *Id.* at 393, 493 A.2d at 482.

By contrast, many courts have found that in the case of parental death, grandparents' standing to petition for visitation is based upon

a "derivative rights" theory which permits the grandparents to stand in the shoes of a deceased parent so that the child is not completely cut-off from one side of the family. *See* Ingulli, *Grandparent Visitation Rights: Social Policies And Legal Rights*, 87 W. VA. L. REV. 295, 311 (1985). When courts adhere to the theory that a grandparent's status is derived from that of the natural parent, an adoption which terminates the rights of the parent is generally also held to end the status of the grandparent upon which the statutory right to visitation rests, thereby divesting the grandparent of court-ordered visitation privileges. *See, e.g., Poe v. Case*, 263 Ark. 488, 565 S.W.2d 612 (1978); *Browning v. Tarwater*, 215 Kan. 501, 524 P.2d 1135 (1974); *Bikos v. Nobliski*, 88 Mich. App. 157, 276 N.W.2d 541 (1979).

■ Relying on these cases, the defendant urges, in essence, that we adopt the reasoning of the derivative rights theory and terminate the plaintiff's visitation privileges. We decline the defendant's invitation for several reasons. First, we note that many of the leading cases in this area, cited above and relied upon by the defendant, have been preempted by subsequent legislative enactments. *See, e.g.,* ARK. STAT. ANN. § 9-13-103 (1987) (overrules *Poe v. Case supra*); KAN. STAT. ANN. § 38-129 (1986) (overrules *Browning v. Tarwater supra*); MICH. COMP. LAWS ANN. § 722.27b (West Supp. 1989) (overrules *Bikos v. Nobliski supra*).

Second, the issue has typically been viewed by courts as a clash between conflicting policies embodied in the State's applicable visitation and adoption statutes. Faced with a visitation statute that authorized continuing contacts with certain categories of grandparents and an adoption statute that divested all legal rights of parents and collateral kindred with respect to the child, courts often reconciled the apparent dilemma by finding that the adoption statute superseded the visitation statute and extinguished grandparental rights. *See Ex parte Bronstein*, 434 So. 2d 780, 782 (Ala. 1983); *Matter of Adoption of Gardiner*, 287 N.W.2d 555, 559 (Iowa 1980). However, in the case before us, there is no statutory conflict because the plaintiff's visitation privileges are founded upon the best interests of the child, rather than any statutory recognition of inherent or derivative rights of kinship. Manifestly, it cannot be said that the plaintiff's rights are dependent upon her legal status as a grandparent, and hence, the New Hampshire adoption statute does not operate to automatically divest the plaintiff's rights.

We note, moreover, that even where grandparent visitation is premised upon statutory authority, many jurisdictions expressly authorize visitation in the context of stepparent adoption. Dismayed by the unhappy results of cases which proclaimed, by judicial fiat, that adoption forever precludes grandparents from visiting their grandchildren, many State legislatures responded by enacting statutes which expressly uphold the vitality of court-ordered visitation when it is followed by stepparent adoption. *See, e.g.,* CAL. CIV. CODE § 197.5 (1971); CONN. GEN. STAT. § 46b-59 (1983); FLA. STAT. 752.01 (1989); IND. CODE ANN. § 31-1-11.7-2 (1989); KAN. STAT. ANN. § 38-129 (1986); LA. REV. STAT. ANN. § 9:572 (West Supp. 1989); MASS. GEN. LAWS ANN. c. 119, § 39D (West Supp. 1989); MICH. COMP. LAWS ANN. § 722.27b (West Supp. 1989); MINN. STAT. 257.022 (1988); MISS. CODE ANN. §§ 93-16-3, 93-16-7 (Supp. 1989); MO. ANN. STAT. § 452-402 (Supp. 1989); MONT. CODE ANN. § 40-9-102 (1989); NEV. REV. STAT. 125A.330 (1990); N.M. STAT. ANN. § 40-9-2 (1987); N.C. GEN. STAT. § 50-13.2(b1) (1989); N.D. CENT. CODE § 14-09-05.1 (Supp. 1989); OKLA. STAT. ANN. Tit. 10, § 5 (West Supp. 1986); PA. STAT. ANN. Tit. 21-23, § 5314 (West Supp. 1984); S.D. CODIFIED LAWS ANN. § 25-4-54 (1984); TENN. CODE ANN. § 36-6-301 (1984); VT. STAT. ANN. Tit. 15 § 1016 (Supp. 1987).

In other jurisdictions, the same result has been reached judicially. *See In re Marriage of Aragon,* 764 P.2d 419, 421 (Colo. App. 1988); *Patterson v. Keleher,* 365 N.W.2d 22, 26 (Iowa 1985); *Welsh v. Laffey,* 474 N.E.2d 681, 684 (Ohio App. 1984); *Chavis v. Witt,* 285 S.C. 77, 79, 328 S.E.2d 74, 75 (1985); *Petition of Nearhoof,* 359 S.E.2d 587, 592 (W. Va. 1987). *But see Mickey v. Beinhauer,* 100 Or. App. 529, 786 P.2d 1317 (1990); *Matter of Adoption of RDS,* 787 P.2d 968 (Wyo. 1990).

The New Hampshire adoption statute provides in pertinent part that:

"Upon the issuance of the final decree of adoption, the adopted child shall be considered the child of the adopting parent or parents, entitled to the same rights and privileges and subject to the same duties and obligations as if he had been born in wedlock to the adopting parent or parents . . . the adopted child shall no longer be considered the child of his natural parent or parents and shall no longer be entitled to any of the rights or privileges or subject to any of the duties or obligations of a child with respect to the natural parent or parents; but, when a child is adopted by a step-

parent, his relationship to his natural parent who is married to the stepparent shall in no way be altered by reason of the adoption."

RSA 170-B:20.

Although courts were once fond of employing a botanical analogy between the consequences of adoption and tree surgery, describing adoption as a decree which "severs the child from its own family tree and engrafts it upon another," the majority of jurisdictions now recognize, at least implicitly, that such an analogy loses its rationale in the case of a stepparent adoption where the child remains firmly attached to one side of his natural family tree, despite the broken branches on the other side. *Bailey v. Menzie*, 542 N.E.2d 1015, 1017 (Ind. App. 3rd Dist. 1989). Thus, many courts now distinguish between a stepparent adoption, where the child remains in the legal custody of a natural parent, and a traditional adoption, where the child receives two new parents, and both of the natural parents, together with their extended families, are substituted out. *See Patterson v. Keleher supra.*

In the case of a traditional adoption, where the child is an infant and emotional bonds have not yet formed with natural relations, there are policy reasons for secrecy which justify a shield of confidentiality ensuring anonymity and precluding post-adoption visitation. When parents surrender their newborn infants for adoption by strangers, complete severance of family ties "permits the formation of a relationship with the new parents that hopefully can 'bloom and grow forever' free of the threat of outside interference." *In re Nicholas*, 457 A.2d 1359, 1360 (R.I. 1983) (citation omitted). However, it is almost too obvious to state that the concern for secrecy is not compelling in the stepparent adoption of an older child, where a substantial relationship already exists between the child and his grandparents, and anonymity cannot be achieved because the child knows and remembers his grandparents and retains emotional ties with them after adoption.

In a situation such as the present one, where the child's natural parent has died suddenly, the love and commitment of grandparents can be a source of security which lessens the trauma occasioned by the parent's death. To abruptly terminate such a meaningful relationship would be cruel and inhumane, and would frustrate the policy behind our adoption statute, which seeks to further the welfare of the child. Accordingly, we hold that the child's adoption by his stepfather has no effect, *per se*, upon the court-

ordered visitation rights of his paternal grandmother. The trial court concluded that the best interests of the child would be served by continued visitation, and we find no abuse of discretion. We note that the trial court's order, like all orders concerning visitation, is subject to modification at any time upon a showing of changed circumstances affecting the welfare of the child.

■ Although the plaintiff requests attorney's fees, we cannot conclude that this action was commenced or prolonged without "any reasonable claim in the law as it is, or as it might arguably be held to be," *Keenan v. Fearon*, 130 N.H. 494, 502, 543 A.2d 1379, 1383 (1988), and accordingly, we decline to award attorney's fees.

*Affirmed.*

THAYER, J., with whom SOUTER, J., joined, concurred specially; the others concurred.

THAYER, J., concurring specially: My concern over extending our case law regarding grandparent visitation from the facts presented in *Roberts v. Ward*, 126 N.H. 388, 493 A.2d 478 (1985) to those centering around the adoption statute is tempered by the Legislature's amendment to the grandparent visitation statute, RSA 458:17-d (Supp. 1989), effective January 1, 1990. No one, however, has claimed that, if applicable, that statute would affect the outcome of this case.

SOUTER, J., joins in the special concurrence.