Sara Ann **SIGHTES** and **William Sightes,**
Appellants–Respondents,

v.

Judith **BARKER,** Appellee–Petitioner.

No. 46A05–9702–JV–52.

Court of Appeals of Indiana.

Aug. 15, 1997.

Transfer Denied Nov. 5, 1997.

Scott H. Duerring, Michigan City, for Appellants–Respondents.

W. Jonathan Forker, LaPorte, for Appellee–Petitioner.

Jeffrey A. Modisett, Attorney General, Jon Laramore, Chief Counsel, Appeals Division, Indianapolis, for Amicus Curiae.

## OPINION

SHARPNACK, Chief Judge.

Sara and William Sightes appeal the trial court's denial of their motions to dismiss the grandparent visitation petition relating to their son, J.S. The Sightes raise two issues on review, which we restate as:

1) whether the trial court erroneously denied their first motion to dismiss for lack of subject matter jurisdiction; and

2) whether trial court erroneously denied their second motion to dismiss alleging that the Grandparent Visitation Act (the "Act") is unconstitutional.

We affirm.[1]

The facts most favorable to the judgment follow. On April 21, 1989, Sara, who was seventeen years old, gave birth to J.S. Michael Runkel is J.S.' father. Although Michael and Sara never married, paternity was established in 1990. After J.S. was born, Sara lived with her parents and attended college.

On August 12, 1991, Judith Barker, who is Michael's mother, filed a petition to establish grandparent visitation. Although Sara ini-

1. We note that the Sightes limit the scope of their appeal to the denial of the motions to dismiss and state that they "are not appealing or collater-
ally attacking the court's entry of the order permitting grandparent visitation." Reply brief, p. 1.

tially objected to the petition, she later entered into a stipulation granting Judith visitation.

Sara subsequently married William Sightes, who adopted J.S. on May 20, 1994. On the same day, Judith filed a rule to show cause alleging that Sara had refused to comply with court orders concerning visitation. On August 12, 1994, Sara and Judith entered into a stipulation to resolve the rule to show cause. On August 19, 1994, Sara filed a petition to terminate Judith's visitation. Judith filed another rule to show cause against Sara on November 30, 1994.

After conducting hearings on the rules to show cause and the petitions, the trial court denied Sara's petition to terminate visitation and found her in contempt of court for denying Judith visitation with J.S. from July of 1994 to September of 1995. In addition, the trial court entered a monetary judgment against Sara in the sum of $2,620.80.

On July 5, 1996, Sara and William filed a motion to dismiss for lack of subject matter jurisdiction. On August 7, 1996, Sara and William filed another motion to dismiss based upon constitutional grounds. The trial court denied their motion to dismiss for lack of subject matter jurisdiction on August 8, 1996. Thereafter, Sara and William filed a motion to correct errors. On October 15, 1996, the trial court entered an order denying the motion to correct errors and the motion to dismiss based upon constitutional grounds. Sara and William now appeal the denial of their motions to dismiss.

■ The first issue for our review is whether the trial court erroneously denied the motion to dismiss for lack of subject matter jurisdiction. The trial court's order provides in part:

"3. The motion is without substantive merit for the reason that it rests on the erroneous proposition that William sights [sic] is not a "stepparent" as that term was utilized by the legislature in Indiana Code 31–1–11.7–2(c)(1);

4. Assuming, arguendo, that William Sights [sic] is not a "stepparent" for purposes of Indiana [C]ode 31–1–11.7–2(c)(1), that conclusion would operate to defeat this court's *jurisdiction over the particular case*—as opposed to its subject matter jurisdiction; it follows in turn that Sara and William Sights [sic] waived their right to object to this court's continued exercise of jurisdiction over this case when they failed to raise this issue at the earliest opportunity subsequent to the date of adoption by William Sights [sic]: May 20, 1994; here, Sara and William Sights [sic] actively and extensively litigated visitation issues throughout 1995, including a lengthy hearing in which the affirmative relief of the termination of Judith Barker's visitation rights was sought on substantive 'best interests' grounds and denied by this court."

Record, pp. 143–144 (original emphasis).

Grandparental visitation rights are conferred by statute in Indiana pursuant to the Act. Ind.Code § 31–1–11.7–1 *et seq.* This Act permits parties to seek visitation with their grandchildren as follows:

"(a) A child's grandparent may seek visitation rights if:

(1) the child's parent is deceased;

(2) the marriage of the child's parents has been dissolved in Indiana; or

(3) the child was born out of wedlock.

However, a court may not grant visitation rights to a paternal grandparent of a child who is born out of wedlock under subdivision (3) if the child's father has not established paternity in relation to the child.

\*　　\*　　\*　　\*　　\*　　\*

(c) Visitation rights provided for in subsection (a) or (b), survive the adoption of the child by any of the following:

(1) A stepparent.

(2) A person who is biologically related to the child as a grandparent, sibling, aunt, uncle, niece, or nephew."

I.C. § 31–1–11.7–2(a), (c). The only circumstances in which a grandparent may seek visitation rights are those enumerated in the Act. *Lockhart v. Lockhart,* 603 N.E.2d 864, 867 (Ind.Ct.App.1992). Pursuant to the Act, a grandparent who is seeking visitation of a grandchild born out of wedlock must file the petition in a circuit or superior court of the county in which the child resides. I.C. § 31–

1–11.7–6. Visitation rights may be granted when the court determines that it is in the best interest of the child. I.C. § 31–1–11.7–3(a). In determining the best interest of the child, the court may consider whether a grandparent has had or has attempted to have meaningful contact with the child. I.C. § 31–1–11.7–3(b). The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child. I.C. § 31–1–11.7–8.

There is no dispute that at the time Judith filed her petition, she was a "grandparent" within the meaning of the Act and that her petition was properly filed in the LaPorte Circuit Court. Judith is the grandparent of J.S., who is a child born out of wedlock and who resides in LaPorte County. However, the Sightes argue that because William subsequently adopted J.S., Judith's right to visitation was extinguished and the trial court lost jurisdiction over the case. The Sightes contend that William is not a "stepparent" within the meaning of the statute and, as a result, Judith's visitation rights did not survive the adoption of J.S. We disagree.

The legislature stated its clear intention that grandparents' visitation rights survive adoption of the child by a stepparent when it amended the Act. *See* I.C. § 31–1–11.7–2(c)(1). However, the Sightes contend that William is not a "stepparent" within the meaning of the statute because Sara was not married to Michael at the time of J.S.' birth. In other words, the Sightes allege that a "stepparent" exists only when the parent was previously married at the time of the child's birth. The Sightes would have us hold that where a child who was born out of wedlock is adopted by a new spouse of the child's parent, grandparental visitation rights do not survive. We find no evidence of such a selective intention to restrict the definition of "stepparent" in the statute.

We will not interpret a statute which is clear and unambiguous on its face. *Moses v. Cober,* 641 N.E.2d 668, 670 (Ind.Ct. App.1994). We must examine and treat it as a whole, giving the statute its apparent and obvious meaning. *Id.* When construing a statute, we will presume the legislature intended the language of the statute to be applied in a logical manner, consistent with its underlying goals and policy. *Collins v. Thakkar,* 552 N.E.2d 507, 510 (Ind.Ct.App. 1990), *trans. denied.* The legislature is presumed to have had in mind the history of the statute and the decisions of the courts upon the subject matter of the legislation being construed. *Indiana State Bd. of Health v. Journal–Gazette Co.,* 608 N.E.2d 989, 992 (Ind.Ct.App.1993) *adopted by* 619 N.E.2d 273. Our role on appeal is to interpret and apply the statute, and absent some ambiguity, we may not substitute language which is not there. *In re A.B.,* 582 N.E.2d 913, 915 (Ind.Ct.App.1991).

In 1985, the legislature amended the Act to permit a grandparent's right to visitation to survive the adoption by a stepparent. Pub.L. No. 281–1985. In view of the specific changes in the Act, the legislature contemplated the situation where a parent marries and has the spouse adopt the child by specifically providing that visitation rights survive such an adoption. The legislature's amendment, however, does not support the inference that visitation rights only survive where the stepparent adopts a child who was born of a previous marriage. The amendment to the Act merely confers standing upon grandparents who wish to exercise visitation but whose grandchildren have been adopted by the new spouse of the parent. Stated differently, the fact that a child is adopted by a stepparent no longer serves as an automatic bar against grandparents who wish to exercise visitation.

Nothing in the Act suggests that grandparents who seek visitation of a child born out of wedlock who was later adopted by a stepparent would lose their rights merely because the child was not born of a previous marriage. The legislature did not distinguish between a "stepparent" who adopts a child born of a previous marriage and a "stepparent" who adopts a child born out of wedlock. The legislature did, however, clearly distinguish between adoptions where one of the natural parents is still a custodian and those where the child is placed with people wholly unrelated to the child. In *Bailey v. Menzie,* we recognized the shift in Indiana

law toward a less drastic treatment of adoption:

> "The Legislature has obviously chosen to alter its course in family law. No longer can we employ, as we were once so fond of doing, that botanical analogy between the consequences of an adoption and tree surgery to the effect that 'a decree of adoption severs the child from its own family tree and engrafts it upon that of another.'"

*Bailey v. Menzie*, 542 N.E.2d 1015, 1017 (Ind.Ct.App.1989). The legislature has recognized a difference between an adoption in the traditional sense of a wholly new family unit and an adoption where the new family unit contains a natural parent and a stepparent. *Id.* at 1018. In the former, it is imperative that most ties be dissolved while in the latter case, the Act implicitly accepts the position that certain biological ties are worthy of respect. *Id.*

The apparent and obvious meaning of the statute, treated as a whole, is that the legislature intended grandparent visitation rights to survive an adoption by a new spouse of a child's parent. This intent would preserve the relationship and visitation between a grandparent and a child even when the parent marries. There is no justification for disrupting the relationship and visitation simply because the parent marries; the relationship between the grandparent and grandchild does not change because an unrelated party enters the family. As such, the strong policy for preserving the relationship between the grandparent and child after the marriage of the parent still exists regardless of whether the child was born out of wedlock or was born of a previous marriage. Consequently, there is no strong policy reason for interpreting the statute to mean that visitation survives the adoption by a "stepparent" only where the child was born of a previous marriage. The result of that interpretation would be to punish a child by cutting off the child's visitation with a grandparent when the child's parent marries merely because the child was not born of a marriage.

Therefore, we conclude that for the purposes of the Act, adoption by a "stepparent" includes adoption by a parent's spouse when the child was born out of wedlock. Consequently, a grandparent may seek visitation with a grandchild pursuant to the Act if the child is adopted by a stepparent even if the child was born out of wedlock. Accordingly, we affirm the trial court's denial of the motion to dismiss on the basis that because J.S. was born out of wedlock and was adopted by a stepparent, Judith could seek visitation with her pursuant to I.C. § 31–1–11.7–2.

■ The second issue for our review is whether the trial court erroneously denied the motion to dismiss on the grounds that the Act is unconstitutional. The Sightes contend that the Act "is unconstitutional in that it permits unwarranted state intrusion into the fundamental right of an intact family unit to decide what is best for their child." Appellants' brief, p. 10. After an extensive review of similar statutes across the nation and opinions of various state courts, we conclude that a careful reading of the statute frees it of constitutional difficulties.

■ Where possible, we will embrace an interpretation that renders a statute, or amendment thereto, constitutional. *Bailey*, 542 N.E.2d at 1017. Thus, we must endeavor to construe the Act so as not to render it "obnoxious to constitutional prohibitions." *Id.* (quoting *State v. Rice*, 235 Ind. 423, 425, 134 N.E.2d 219, 221 (1956)). When drafting the Act, the legislature had to balance two competing interests: the rights of parents to raise their children as they see fit and the rights of the grandparents to participate in the lives of their grandchildren. *See Lockhart*, 603 N.E.2d at 866.

The Sightes contend that parents have a constitutionally recognized fundamental right to raise their child as they see fit. It is true that the United States Supreme Court has held that the right to raise one's children is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)(stating that "[w]hile this court has not attempted to define with exactness the liberty thus guaranteed [by the Fourteenth Amendment], ... [w]ithout doubt, it denotes not only merely freedom from bodily restraint but also the right of the individual

to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men"). In *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977), the Court stated that it "has long recognized that freedom of personal choices in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *See also Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)(recognizing constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education).

However, the constitutionally protected right of family autonomy is not absolute. There are many circumstances related to child health and well-being in which state intervention is constitutional. *See, e.g., Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968), *reh'g denied.* In *Prince v. Massachusetts*, 321 U.S. 158, 166–167, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), *reh'g denied,* the Court recognized that a "state has a wide range of power for limiting parental freedom" and thus "may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." In addition, parents are required by law to see that their children are inoculated against disease, that they are not abused, and that they are restrained when riding in a motor vehicle. Thus, over the years, there has been increased legislation guaranteeing the safety, education, and the physical and emotional welfare of children.

Although parents have a constitutional right to make decisions affecting the family, the degree of the infringement by the state is a significant consideration in determining whether courts will strike down a statute as unconstitutional. In *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), the Court considered the constitutionality of a statute prohibiting marriage by any resident who had a child support obligation without a prior judicial determination that the child support has been paid and that the minors "'covered by the support order are not then and are not likely thereafter to become public charges.'" *Id.* at 375, 98 S.Ct. at 675. Addressing the degree of permissible state infringement, the Court stated that:

"[b]y reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."

*Id.* at 386, 98 S.Ct. at 681.

In a long line of cases, the Court has evaluated state regulation of fundamental rights with reference to the magnitude of the state's infringement on a particular fundamental right. Dissenting in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled by Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), Justice O'Connor pointed out that not every regulation the State imposes must be measured against the State's compelling interests and examined with strict scrutiny. She stated that:

"The Court and its individual Justices have repeatedly utilized the 'unduly burdensome' standard in abortion cases. The requirement that state interference 'infringe substantially' or 'heavily burden' a right before heightened scrutiny is applied is not novel in our fundamental-rights jurisprudence, or restricted to the abortion context. In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 37–38 [93 S.Ct. 1278, 1299–1300] (1973), we observed that we apply 'strict judicial scrutiny' only when legislation may be said to have 'deprived, infringed, or interfered' with the free exercise of some such fundamental right or personal liberty.' If the impact of the regulation does not rise to

the level appropriate for our strict scrutiny, then our inquiry is limited to whether the state law bears 'some rational relationship to legitimate state purposes.' Even in the First Amendment context, we have required in some circumstances that state laws 'infringe substantially' on protected conduct."

*Id.* at 462, 103 S.Ct. at 2510; *see Casey,* 505 U.S. at 833, 112 S.Ct. at 2796; *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989).

Furthermore, in *Bailey v. Menzie,* we followed the reasoning set forth in People ex rel *Sibley v. Sheppard,* 54 N.Y.2d 320, 445 N.Y.S.2d 420, 429 N.E.2d 1049 (1981). In *Sibley,* New York's highest court stated:

"In determining whether a State's interference with the family relationship is proper, the action will not be reviewed under exacting scrutiny, but according to a less rigorous standard of whether there is a 'reasonable relation to any end within the competency of the State' (*Meyer v. State of Nebraska,* 262 U.S. 390, 403, 43 S.Ct. 625, 628, 67 L.Ed. 1042 ... *Cleveland Bd. of Educ. v. La Fleur,* 414 U.S. 632, 643, 94 S.Ct. 791, 797, 39 L.Ed.2d 52; *Pierce v. Society of Sisters,* 268 U.S. 510, p. 535, 45 S.Ct. 571, p. 573, 69 L.Ed. 1070, supra)."

*Id.,* 445 N.Y.S.2d at 424, 429 N.E.2d at 1053.

A comparison of the visitation rights contemplated for grandparents under the Act with the magnitude of the infringements in the cases relied upon by the Sightes demonstrates that the Act presents no constitutional deficiency. The case precedent relied upon by the Sightes encompasses child labor laws for girls under eighteen years old (*Prince,* 321 U.S. at 158, 64 S.Ct. at 438), a prohibition on teaching foreign languages in any school to children who had not yet completed eighth grade (*Meyer,* 262 U.S. at 390, 43 S.Ct. at 625), a complete and permanent termination of parental rights (*Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)), the commitment of a child by the parents (*Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)), the right to marry without court approval (*Zablocki,* 434 U.S. at 374, 98 S.Ct. at 673), and the decision concerning what schools children are to attend (*Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). Unlike these significant infringements, visitation rights by grandparents as defined by the Act are less than a substantial encroachment on the parent's fundamental rights or the autonomy of the nuclear family. The Act contemplates occasional, temporary visitation, which may only be allowed if a trial court finds visitation to be "in the best interests of the child." I.C. § 31–1–11.7–3(a). Grandparents are members of the extended family whom society recognizes as playing an important role in the lives of their grandchildren, the importance of which has been given added meaning by the legislature's policy judgment underlying the Act. However, the Act does not presume that grandparent visitation is necessarily in the children's best interest. Instead, the burden is on the grandparent, as the petitioning party, to demonstrate by a preponderance of the evidence that court-ordered visitation is in the children's best interest. *See* I.C. § 31–1–11.7–3. If such a showing is made, it falls to the court to evaluate the evidence, assess the circumstances, and carefully devise a visitation schedule that is in the children's best interest.

As such, permitting grandparent visitation over the adoptive parents' objection does not unconstitutionally impinge upon the integrity of the adoptive family. The state, in its role as *parens patriae,* has determined that, under certain circumstances, grandparents should have continuing contacts with the child's development if it is in the child's best interest. Protecting the best interest of a child is unquestionably a proper exercise of the police power. Permitting the natural grandparents to bring the child's custodian into court to determine whether they should be granted the right to visit the child is a procedure reasonably related to the goal of protecting the best interest of the child.

Central to our finding is the protection afforded the child, the parents, and the grandparents in the Act. If the statute gave grandparents an unrestricted vested right of visitation, we would be far more likely to question its constitutionality. However, un-

der the existing statutory scheme, a court cannot grant visitation until a verified petition is filed in a circuit or superior court, a hearing is conducted, a decree is entered setting forth the trial court's findings and conclusions, and a finding is made that the best interests of the children will be served by granting visitation. *See* I.C. §§ 31–1–11.7–3 to 31–1–11.7–7. In addition, the visitation schedule is in no way permanent, but may be modified as necessary to meet the evolving best interests of the children. I.C. § 31–1–11.7–8. Such judicial oversight adequately protects the integrity of the family while promoting the welfare of the children. Fortunately, it is not a common occurrence for this statute to be called into play, but when it is, the parties are afforded ample protection to preclude either injustice or an unwarranted intrusion into the fundamental liberty of the parents and child.

At common law, grandparents had no legal right to visitation. However, the legislature determined that, in modern society, it was essential that some semblance of family and generational contact be preserved. As a result, the legislature designed the Act to promote intergenerational contact and strengthen the bonds of the extended family. One court summarized this policy for a similar act as follows:

"[m]odern society has witnessed a general trend toward disintegration of the nuclear family. Changes in the demographics of domestic relations, the rise in the divorce rate, and the increasing numbers of children born to single parents are but a few of the factors contributing to the destabilization of the traditional nuclear family. Given such circumstances, it is not unreasonable for our legislature to attempt to strengthen intergenerational ties as an alternative or supplementary source of family support for children."

*Campbell v. Campbell*, 896 P.2d 635, 643 (Utah.Ct.App.1995). Another court stated:

"In an era in which society has seen a general disintegration of the family, it is not unreasonable for the General Assembly to attempt to strengthen familial bonds. As this Court observed ... 'the grandparents' visitation statute was an appropriate response to the change in the demographics of domestic relations, mirrored by the dramatic increase in the divorce rate and in the number of children born to unmarried parents, and the increasing independence and alienation within the extended family inherent in a mobile society.' ... There is no reason that a petty dispute between a father and son should be allowed to deprive a grandparent of the unique relationship that ordinarily exists between those individuals. One of the main purposes of the statute is to prevent a family quarrel of little significance to disrupt a relationship which should be encouraged rather than destroyed."

*King v. King*, 828 S.W.2d 630, 632 (Ky.1992), *cert. denied*, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289. Under ordinary circumstances, few would dispute that there are benefits to be derived from the establishment of a bond between grandparent and grandchild. Each benefits from contact with the other. "The child can learn respect, a sense of responsibility and love. The grandparent can be invigorated by exposure to youth, can gain an insight into our changing society, and can avoid the loneliness which is so often a part of an aging parent's life." *Id.* In addition, the state has a stronger argument for court intervention to protect the extended family when the nuclear family has been dissolved. *Hawk v. Hawk*, 855 S.W.2d 573, 580 n. 10 (Tenn.1993).

We agree that these are appropriate grounds for upholding the constitutionality of a grandparent visitation statute. All of the considerations discussed by these courts in support of their statutes are equally applicable in support of Indiana's Act. These considerations do not go far in intruding into the fundamental rights of parents. In so saying, we are fully cognizant of parents' well settled right under the Fourteenth Amendment to raise their families generally as they see fit. Nonetheless, Indiana's Act interferes with a parent's liberty interests only to observe its duty under the *parens patriae* doctrine and only upon a finding that it would be in the best interest of the child. *Bailey*, 542 N.E.2d at 1020.

As noted in *Meyer*, "[t]he established doctrine is that this liberty may not be interfered with under the guise of protecting the public interest by legislative action which is arbitrary or without reasonable relation to some purpose within the competence of the state to effect." *Meyer*, 262 U.S. at 400, 43 S.Ct. at 627. However, it is not unreasonable for the state to say that the development of a loving relationship between family members is desirable and the arbitrariness of the statute is obviated by the requirement that visitation be granted by a court only after finding that it is in the best interest of the child. "That the state may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected." *Id.* at 401, 43 S.Ct. at 627. The Act seeks to balance the fundamental rights of the parents and the rights of the grandparents to participate in the lives of their grandchildren. *See Lockhart*, 603 N.E.2d at 866.

Therefore, we conclude that, because grandparent visitation as provided by the Act does not unduly burden a parent's autonomous right to raise his or her children, we do not apply strict scrutiny to determine the statute's constitutionality. Rather, we hold the statute to be constitutional because it is rationally related to furthering the legitimate state interest in fostering relationships between grandparents and their grandchildren.[2]

We note that at least one jurisdiction has recently taken the approach urged by the Sightes that the strict scrutiny test must be applied in this instance because grandparent visitation infringes upon a fundamental right. *Michael v. Hertzler*, 900 P.2d 1144 (Wy. 1995). As the court in *Michael* found, however, grandparent visitation statutes satisfy the heightened scrutiny. The court noted that strict scrutiny is "the standard applied when it becomes necessary to balance a fundamental right against a compelling state interest. It requires the establishment of the compelling state interest and the showing that the method of achieving such is the least intrusive of those methods by which such can be accomplished." *Id.* at 1147. Applying the strict scrutiny standard to the grandparent visitation statute, the court found that the state had a compelling interest in the state's role as *parens patriae* in protecting the health, safety, and welfare for the best interest of the child. *Id.* at 1149. The court then weighed the compelling state interest against the parent's fundamental liberty right. In doing so, the court noted that the parent's right is not "unfettered." *Id.* The court reasoned:

"a state derives power to adopt regulations for the well-being of its citizens from its police power. The police power is the inherent plenary power possessed by the state not only to prevent its citizens from harming one another, but to promote all aspects of public welfare.... Society clearly condones intrusions upon parental rights which are justified in the face of abuse or neglect.... The Supreme Court of the United States clearly has recognized that children are 'persons'

---

**2.** We note that the majority of courts that have addressed the constitutionality of grandparent visitation statutes authorizing visitation if in the best interest of the child have upheld those statutes as constitutional. *See, e.g., Campbell*, 896 P.2d at 644; *R.T. v. J.E.*, 277 N.J.Super. 595, 650 A.2d 13, 16 (Ch.1994); *Sketo v. Brown*, 559 So.2d 381, 382 (Fla.App.1990); *Spradling v. Harris*, 13 Kan.App.2d 595, 778 P.2d 365, 368 (1989); *King*, 828 S.W.2d at 631–632; *Herndon v. Tuhey*, 857 S.W.2d 203, 208 (Mo.1993); *Roberts v. Ward*, 126 N.H. 388, 493 A.2d 478, 481 (1985); *Sibley*, 445 N.Y.S.2d 420, 429 N.E.2d at 1053. Although the Tennessee Supreme Court has held that Tennessee's grandparent visitation statute is unconstitutional under the Tennessee Constitution, the court did not decide whether the statute is unconstitutional under the United

States Constitution. *See Hawk*, 855 S.W.2d at 582. The Tennessee Constitution acknowledges a right of privacy which encompasses the fundamental right of parents to raise their children as they see fit, and the court held that unless substantial harm threatens a child's welfare, the state cannot intervene without a sufficiently compelling justification. *Id.* Therefore, under Tennessee law, the state may not interfere in any parental decision that may adversely affect a child unless the parent's action "substantially endanger[s] the welfare of their children." *Id.* We do not believe that this same standard applies under the federal constitution unless there is a substantial infringement by the state on a family relationship. *See Herndon*, 857 S.W.2d at 211.

within the meaning of the Bill of Rights. There the Court said: Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligation to the State.... In our cases, the right to associate with one's family is identified as a fundamental liberty ... We perceive this interest to be an equivalent fundamental right to that asserted by [the parent]. It is available to children and grandparents, as well as parents, and the state has an equal duty to protect the fundamental rights of the grandparents and the children.... We conclude that, in addition to the compelling state interest attaching to the best interest of the children, the compelling state interest exists in maintaining the right of association of grandparents and grandchildren. The relative interests of the parties, parents, grandparents, and children must be balanced and procedural protections or safeguards must be present as the situation demands. We are satisfied that the [grandparent visitation act] contains the appropriate safeguards. While the grandparent may bring the action to seek visitation, it cannot be granted until a hearing is conducted to determine if the visitation is in the best interest of the child and the rights of the child's parents are not substantially impaired.... We are satisfied that this statute is narrowly drawn." *Id.* at 1149–1151. The court concluded by recognizing that the balancing of the fundamental interests of the parents, grandparents, and children is not an easy task. However, the court stated that "[i]t will be a difficult decision in many instances, but the standard incorporated in the statute, the best interest of the child, is well recognized, and the court clearly can control those rights so the rights of the parents will not be substantially impaired." *Id.* at 1151.

■ With this reasoning in mind, we also conclude that even if we apply the heightened standard of strict scrutiny, the Act passes constitutional muster. We agree that the state has a compelling interest in protecting the welfare of the child. In addition, this interest outweighs the rights of the parent because the Act is not more intrusive than is necessary to promote the welfare of the child. We have already discussed the measures included in the Act to protect the parents, grandparents, and the children. The Act does not afford an automatic right to grandparents, but rather only provides an opportunity for certain grandparents to file a petition seeking visitation. *See* I.C. § 31–1–11.7–2. The trial court must still determine that the visitation is in the best interest of the child before the grandparent's petition will be granted. *See* I.C. § 31–1–11.7–3. Therefore, we conclude that even when the heightened scrutiny is applied, the Act is constitutional. *See Michael,* 900 P.2d at 1151. Accordingly, the trial court did not err by denying the motion to dismiss on constitutional grounds.

For the foregoing reasons, we affirm the judgment of the trial court in all respects. Affirmed.

DARDEN and BARTEAU, JJ., concur.