Sullivan
No. 2004-721

## IN THE MATTER OF R.A. AND J.M.

Argued: September 29, 2005
Opinion Issued: December 30, 2005

84

*Upton & Hatfield, LLP*, of Concord (*Lauren S. Irwin* and *Matthew R. Serge* on the joint brief, and *Kenneth J. Barnes* orally), for the petitioner.

*Law Office of J. Brandon Giuda, PLLC*, of Epsom (*J. Brandon Giuda* on the brief and orally), for the respondent.

*Stephen A. Cherry & Associates, PLLC*, of Henniker (*Sunny Mulligan* on the joint brief), for the intervenor.

*Mary Pilkington-Casey*, of Concord, by brief, for the Franklin Pierce Administrative Law and Advocacy Clinic, as *amicus curiae*.

BRODERICK, C.J. R.A. (Mother), the petitioner and mother, and R.R. (Grandmother), the intervenor and maternal grandmother, appeal the award of custody of a minor child (Daughter) by the Superior Court (*Brennan*, J.) to J.M. (Father), the respondent and father. At issue is the applicability of RSA 458:17 (2004) (repealed Oct. 1, 2005) in custody disputes between unwed parents, and its constitutionality generally. We affirm in part, vacate in part, and remand.

I

The trial court made the following findings of fact. Daughter was conceived during a one-time sexual encounter in 1993 between Mother and Father, and was born on March 4, 1994. Although Daughter is the child of Mother and Father, only Mother is listed on her birth certificate. Mother and Father were not married to each other at the time of Daughter's conception or birth; Father subsequently married another woman in 2000.

Mother informed Father of the pregnancy in 1993, shortly after she discovered it herself. Father admits that, several weeks after their encounter, Mother informed him that she might be pregnant. According to Father, Mother never confirmed the pregnancy or Daughter's birth, even though he remained in New Hampshire for another year after Daughter's conception. Father asserts that he first became aware of Daughter's birth when he was contacted in 1995 by the New Hampshire Department of Health and Human Services (HHS).

At that time, Father was unemployed and had no permanent address. As a result, he gave HHS his grandmother's address. Mother claims that Father acknowledged to HHS that he was possibly Daughter's father. Father told HHS that he was willing to take a paternity test, but now asserts that it was not done either because he was not given proper notice, or because the testing site was changed at the last moment. Mother asserts that from 1995 to 2000, Father avoided taking the test, and did not take responsibility for their daughter.

During that time, Daughter lived with Mother and Grandmother. Grandmother was present at Daughter's birth, and ten days later Daughter and Mother moved into Grandmother's home in Goshen. Daughter has spent approximately half her life living in Grandmother's home, and the balance with Mother in her own home. Although there have been long periods when Mother left Daughter solely in Grandmother's care, there were occasions when Mother lived with her daughter in Grandmother's home. Even when Daughter and Mother lived in their own home, Daughter would still spend significant time with Grandmother.

Grandmother has participated extensively in Daughter's life, taking her to doctor's appointments and contributing to her educational and

extracurricular activities. She asserts that, even when Mother and Daughter lived in their own home, they continued regular and consistent contact with her. She also contends that she played the primary parental role in Daughter's life, particularly from 2002 to 2004. Father, however, alleges that Mother has been Daughter's primary caregiver. He points out that, during the three years when Daughter and Mother lived in their own home, Grandmother acted only as a secondary babysitter and that Mother used an unrelated person as the primary babysitter.

When Daughter was six and one-half years old, at the urging of his wife, Father took a paternity test which confirmed that he was Daughter's father. In February 2001, one month shy of Daughter's seventh birthday, Mother and Father entered into a uniform support order, and Daughter met her father for the first time. Father also added Daughter to his health insurance and began paying child support, although the trial court found that he was $2,875 in arrears. Father then began visiting Daughter and speaking to her on the phone.

By 2002, Daughter's relationship with Father had progressed to the point that she spent three nights in Massachusetts with Father and his wife. During that summer, Mother experienced significant distress as a result of her alcohol and drug addictions. Both Grandmother and Father cared for Daughter, with Daughter spending five or six weeks in Father's home in Massachusetts.

Due to what they considered to be inappropriate behaviors, Father and his wife suspected that Daughter was suffering the effects of emotional, physical or sexual abuse. In August 2002, they took her to a physician who confirmed that Daughter had likely suffered some sort of abuse. Father informed Mother and Grandmother of his suspicions and told them that he and his wife would like to keep Daughter in Massachusetts.

Mother became concerned that the abuse had occurred while Daughter was in Father's home that summer. Fearing that Father would not return Daughter to her, Mother filed a motion for an *ex parte* order of custody. A temporary hearing was held in August 2002, at which a guardian ad litem (GAL) was appointed to represent Daughter's interests. The court temporarily awarded Mother and Father joint legal custody of their daughter, but granted Grandmother primary physical custody of Daughter, subject to Father's visitation rights on alternate weekends.

As a result of comments Daughter made to another physician and a therapist, Mother, Grandmother and the GAL believed that Daughter had been sexually abused by Father's wife, and in January 2003, Mother filed petitions alleging abuse and neglect against Father and his wife. In June 2003, the court dismissed the petition against Father and stated, with respect to his wife, that it was "not persuaded by a preponderance of the

evidence" that she had sexually abused Daughter. The court then added, "Unfortunately, the court is persuaded by the evidence and testimony presented that the child has been exposed to sexual behavior and may well have been sexually abused or assaulted—but not by [Father's wife]." The court did not state, however, who it thought might have abused Daughter.

In October 2003, Grandmother filed a motion to intervene in the custody dispute between Mother and Father. She requested that the court award legal custody of Daughter jointly to Grandmother, Mother and Father, and that the court award her primary physical custody. Both Mother and the GAL assented to the motion, arguing that RSA 458:17, VI specifically allowed the superior court to award custody to a child's grandparent, and that granting Grandmother's requests would be in Daughter's best interest. Father opposed the motion, arguing that Grandmother lacked standing. The trial court subsequently allowed Grandmother's intervention.

In August 2004, the trial court issued its ruling, which included a legal opinion concerning whether a grandparent could be granted custody under RSA 458:17, VI, as well as a final decree detailing the terms of the custody arrangement. In its legal opinion the court stated that Grandmother "has been a true 'parent' to [Daughter]" and that "[b]oth of [Daughter's] natural parents should be grateful that [Grandmother] has done so much for their child." The trial court determined, however, that Father had "the right to primary physical custody of [Daughter] as well as the responsibilities that go with that right." It rejected the contention of Mother, Grandmother and the GAL that RSA 458:17, VI "was intended to apply in a situation where a natural parent of the child, who is not unfit and who poses no danger of harm to the child, seeks legal and physical custody of the child." The court then observed that, even if this were the legislature's intention, "the provision would probably be unconstitutional." It cited the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000), as supporting this determination.

The final decree granted legal custody to Mother and Father, but not to Grandmother, and gave final decision-making authority to Father rather than Mother. It also explicitly awarded primary physical custody to Father and granted Mother supervised visitation rights with her daughter at Grandmother's home and under Grandmother's supervision. However, the final decree also adopted, by reference, several of the findings of fact and rulings of law proposed by Mother, Father and Grandmother. Many of them are inconsistent with each other, as well as with the final decree itself. For example, despite the plain language of the final decree, the court granted Father's requested legal rulings that: (1) Mother was not fit to exercise legal or physical custody of Daughter; (2) physical custody be

awarded to Father only; and (3) joint legal custody be awarded to Father and Grandmother, and not to Mother.

Mother, Grandmother and the GAL filed motions for reconsideration. In response, the court made some corrections with respect to child support, post-secondary educational expenses, and miscellaneous expenses. While the court granted Grandmother's request to stay the order pending this appeal, the balance of the parties' post-decree motions were denied, leaving in place the inconsistent findings of fact and rulings of law.

On appeal, Mother and Grandmother argue that, in general, third parties may be awarded custody when it is in a child's best interest, and that the trial court committed reversible error in this case when it refused to grant joint legal custody to Grandmother and Father, and primary physical custody to Grandmother. They claim that, because Grandmother and Daughter had a significant "parent-child" relationship, it was in Daughter's best interest for custody to have been awarded jointly to Grandmother and Father, and that the trial court's failure to do so amounts to an unsustainable exercise of discretion. Finally, they urge that we adopt the four-part test articulated in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis.), *cert. denied*, 516 U.S. 975 (1995). This test suggests situations when custody or visitation may appropriately be awarded to a third party. Mother and Grandmother contend that this would remedy the constitutional deficiencies that are at the heart of *Troxel*.

Father requests that we affirm the trial court's legal conclusions, as well as the final decree, arguing that his right to raise and care for his daughter is a fundamental constitutional right. As a result, he urges us to examine the statute under strict scrutiny—that is, that an award of custody to a stepparent or a grandparent must be necessary to advance a compelling state interest, and must be narrowly tailored to that end. He further argues that the trial court was correct not to apply RSA 458:17, VI, but that even if it had, it is merely discretionary and does not require that Grandmother be awarded either physical or legal custody. Accordingly, he asserts that the trial court properly exercised its discretion by granting joint legal custody to him and Mother, to the exclusion of Grandmother, and awarding him sole physical custody with supervised visitation to Mother.

We also permitted the filing of an *amicus* brief. It argues that courts must consider the rights of the child as well as those of the parents, and that we must balance the best interest of the child, the parents' rights and the child's *in loco parentis* relationships when making custody determinations.

## II

Before addressing the merits of the final decree, we first discuss whether RSA chapter 458 applies to the adjudication of custody disputes between unwed parents. In discussing the applicability of that chapter, we recognize that the legislature has recently repealed and recodified many of these provisions. *Compare generally* RSA ch. 458 (2004) *with* RSA ch. 461-A (Supp. 2005) (effective Oct. 1, 2005). As the repeal of these provisions did not take effect until after the trial court decided this case, we will refer to the statutes in effect at the time of the trial court's decision.

Father contends that the superior court heard this case under its general jurisdiction. He thus asserts that, because RSA 458:17 applies only to cases "where there [was] a decree of divorce or nullity," the procedures outlined in paragraph VI are not applicable here. Mother and Grandmother agree that the court's general jurisdiction should govern, as this is a dispute between unwed parents. However, they contend that the superior court should still apply the procedures of RSA 458:17, and be allowed to grant custody to Grandmother as Daughter's grandmother.

We agree with Mother and Grandmother. This court has held that custody disputes between unwed parents fall under the general jurisdiction of the superior court. *Brouch v. Shaw*, 121 N.H. 562, 570-71 (1981). "[I]f both the natural father and the natural mother of a child have existing joint custody rights, then the superior court has authority to enforce and regulate those rights." *Id.* at 569; *see also Ellsworth v. Heath*, 140 N.H. 833, 836-37 (1996). In *Bodwell v. Brooks*, 141 N.H. 508 (1996), we held that the superior court could look to RSA 458:17, VI to decide that case. "Once the superior court has acquired jurisdiction over a custody proceeding between unwed natural parents, it may use its *parens patriae* power to decide whether the best interests of the child warrant the intervention of a stepfather as an appropriate party in the custody determination." *Bodwell*, 141 N.H. at 512.

■ We make a similar determination here. The superior court should look to the child custody statutes of this State for the procedures as to how custody disputes between unwed parents should be resolved. Thus, the trial court here properly allowed Grandmother to intervene and petition the court for custody under RSA 458:17, VI.

## III

Having decided that the procedures set forth in RSA chapter 458 govern this case, I now address the substantive issues raised by the parties. I begin by examining the nature of parental rights under the State and Federal Constitutions.

■ The right of parents to raise and care for their children is a fundamental liberty interest protected by Part I, Article 2 of the New Hampshire Constitution. *In the Matter of Nelson & Horsley*, 149 N.H. 545, 547 (2003). Similarly, the United States Supreme Court has recognized that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. In *Nelson*, we stated that natural or adoptive parents' rights over their children "are not easily set aside. Only in the most unusual and serious of cases may such fundamental rights be abrogated in favor of an *unrelated* third person." *Nelson*, 149 N.H. at 548 (emphasis added). Parental rights "have been found to operate against the State, against third parties, and against the child." *Id.* at 547 (quoting *Roberts v. Ward*, 126 N.H. 388, 391 (1985)).

However, both this court and the United States Supreme Court have previously allowed third parties to gain custody of children over the objections of the children's natural or adoptive parents. Many different factors have informed the decisions in those cases. For example, in *Stanley D. v. Deborah D.*, 124 N.H. 138 (1983), a young girl's mother married a man who was not the child's biological father. They subsequently had a son of their own, and raised the children as brother and sister. When they divorced, we were required to consider whether the man could be granted primary physical custody of the girl, and joint legal custody with her mother even though he was only a stepparent and had not adopted her. *Id.* at 140. We considered it important that a family unit was created during the marriage of the parties, that the man was the only father the girl had ever known, that she was unaware that he was not her biological father, that he had treated her at all times as if she were his daughter, and that he had "loved and supported her and ha[d] formed a psychological parent-child relationship with her." *Id.* at 141.

In *Bodwell*, a woman had a romantic relationship with a man while she and her husband were separated. The affair resulted in the birth of a child. The woman and her husband subsequently reconciled, and they began raising the child as their own. After a paternity suit established that the man was the child's biological father, he petitioned for custody. The mother and her husband, the child's stepfather, requested that they be granted primary physical custody, and joint legal custody with the biological father. The biological father objected to an award of any custody to the stepfather. *See Bodwell*, 141 N.H. at 509-10. In holding that the stepfather could intervene and be granted custody, we noted that he had established an *in loco parentis* relationship with the child, having raised him as his own son and provided both financial and emotional support. A court-appointed guardian ad litem also testified that the stepfather and

child had formed a psychological parent-child relationship. Additionally, we noted the importance of the stepfather's statutory duty to care for the child as his own under RSA 546-A:3 (1974) and RSA 458:17-c. *Id.* at 513-14.

In *In re Diana P.*, 120 N.H. 791, 793 (1980), *cert. denied*, 452 U.S. 964 (1981), *overruled on other grounds by In re Craig T.*, 147 N.H. 739 (2002), we interpreted the term *in loco parentis* to determine whether foster parents could bring a proceeding to terminate the rights of the natural parents, thus allowing them to adopt the child. In holding that the foster parents had standing, we considered whether a parental relationship existed between the foster parents and the child, and how that relationship came about. In that case, the mother's own neglect had led to the placement of her child with the foster parents. This notwithstanding, Justice Brock noted in a concurring opinion that "[u]nder the rules and regulations of the department of welfare, the foster parents do not have the legal authority over [the child] that a natural parent normally has over his own child." *Id.* at 800 (Brock, J., concurring). He emphasized that foster parents receive compensation for the care they provide children. *Id.* at 803.

We agreed that the circumstances surrounding the placement were important. "The fact that a child is placed by an agency with foster parents may weigh against a finding that the foster parents stand in loco parentis to the child, but it is not conclusive. The ultimate determination depends upon a consideration of all the facts." *Id.* at 795 (citation omitted). Because of this, we noted that it is important whether parents consent to their child's placement in a foster home, and more specifically, whether their intent is to ensure proper care for their children only while they are temporarily unable to do so with the hopes of reuniting with their children at a future date. *Id.* at 796-97.

Finally, we also addressed the amount of time the child had lived with the foster parents, noting that the foster parents "should have had the child or children in their home long enough to have formed a 'psychological family.'" *Id.* at 796. Noting that "the time may vary in particular cases," we stated that a few weeks would not be enough, but "at least two or three years would seem sufficient." *Id.* In any event, a controlling factor was whether "any change in custody based solely on a biological relationship might be emotionally harmful to the child." *Id.* at 797.

These cases notwithstanding, we have been careful not to create a broad rule allowing anyone with a close, personal relationship to petition for custody of a child merely because of that relationship. In *Nelson*, an unmarried couple lived together for many years, during which time they had a son. There were periods of time when the couple separated, and during these occasions the woman adopted three other children. The

couple never married. Furthermore, the man stated unequivocally that he would not adopt the woman's other children, although he and the woman raised· them as though they were their own. The couple subsequently separated, and the man petitioned for custody of the children. *Nelson*, 149 N.H. at 544-46. We declined to hold that

> the status of parent should be extended to cover all persons who have established a parental relationship with a child through the *in loco parentis* or psychological parent doctrines, affording them the same constitutional protections. . . . To do so could elevate the rights of any unrelated third person who has spent considerable time caring for a child over the fundamental liberty interests of natural or adoptive parents.

*Id*. at 548-49. Important to our decision was the fact that the man had never become a stepparent of the children. In distinguishing *Nelson* from *Bodwell*, we explicitly upheld the ability of stepparents to continue to intervene in custody determinations between natural or adoptive parents under certain circumstances. *Id*. at 549.

The United States Supreme Court has considered similar factors important in determining the custodial rights of natural or adoptive parents. In *Quilloin v. Walcott*, 434 U.S. 246 (1978), the Court upheld a decision by the Georgia Supreme Court allowing a man to adopt his wife's child over the objection of the biological father. The mother had had custody for the child's entire life, with the biological father providing support only on an irregular basis. Additionally, the biological father "did not petition for legitimation of his child at any time during the 11 years between the child's birth and the filing of [the husband's] adoption petition." *Id*. at 249-54.

However, I disagree with the Supreme Court's reasoning in *Caban v. Mohammed*, 441 U.S. 380 (1979). There a man was allowed to adopt his wife's children over the objections of the biological father, even though the father's name was on the children's birth certificates and he had lived with them and their mother, providing support for the family, throughout the first five years of the oldest child's life. During that time he and the mother had held themselves out as married, although he was still married to another woman. Additionally, he continued to stay in contact with the children even when he and their mother separated. *Id*. at 382.

██ Viewed in light of *Troxel*, I believe that an adoption such as the one in *Caban* would probably now violate the Federal Constitution. However, even if it did not, it could not pass scrutiny under the State Constitution. In *Brauch*, we stated:

The plaintiff father in this case has performed his parental duties. [He] has openly acknowledged [the boy] as his son since birth. He has maintained a close relationship with [the boy] through frequent and extensive visitations. [The father] has continually provided some support for [the boy] and, [for the three years prior to the custody dispute], has assumed sole responsibility for [the boy's] care. Under these circumstances, the plaintiff has "manifested a significant paternal interest in the child" and, therefore, has developed a right to custody equal to that of the natural mother.

*Brauch*, 121 N.H. at 570. Under the New Hampshire Constitution, the rights of natural or adoptive parents may not be abrogated as in *Caban* unless the parents have voluntarily absented themselves from their children's lives, thus demonstrating a lack of significant paternal interest in the children.

Although these cases were decided before *Nelson* and *Troxel*, we and the Supreme Court have a long history of recognizing parents' fundamental rights to the care and custody of their children. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *State v. Robert H.* _____, 118 N.H. 713, 715-20 (1978), *overruled on other grounds by Craig T.*, 147 N.H. 739.

## IV

With these principles established, I now examine whether, as the trial court suggested, RSA 458:17, VI is unconstitutional on its face. Throughout the remainder of this opinion, when referring to "RSA 458:17, VI" or "paragraph VI," I am referring specifically to the sentence, "Nothing in this paragraph shall be construed to prohibit or require an award of custody to a stepparent or grandparent if the court determines that such an award is in the best interest of the child."

■ When determining matters of custody and visitation, a trial court's overriding concern is the best interest of the child. *In the Matter of Kosek & Kosek*, 151 N.H. 722, 725 (2005). In doing so, the trial court has wide discretion, and we will not overturn its determination except where there has been an unsustainable exercise of discretion. *See id.* at 724. Here, the trial court made explicit factual findings, which Father does not dispute, that it was in Daughter's best interest to remain in Grandmother's custody.

However, in this case we are not asked simply to rule upon the sustainability of the custody award. Rather, the issue before us is whether a parent's fundamental right to raise and care for his child prohibits the

State from allowing stepparents or grandparents, under any circumstances, to intervene and be awarded custody absent a finding that the parent is unfit. The trial court in this case stated that if RSA 458:17, VI were interpreted to permit this, it "would probably be unconstitutional" under *Troxel*. I presume, therefore, that the trial court concluded that the statute was so restricted. The court additionally concluded that, as a matter of law, it was not "in the best interest of [Daughter] for physical custody to be placed with [Grandmother], pursuant to RSA 458:17." This conclusion, however, is at odds with the court's express finding that it was in "[Daughter's] best interest to maintain the strong bond she has with her grandmother" and that she "remain in the custody of her maternal grandmother."

Therefore, I must decide whether a fit parent's fundamental rights prohibit an award of custody to a stepparent or grandparent, as allowed for in RSA 458:17, VI, and if so, whether the statute can be constitutionally applied to the custody dispute between Mother and Father. The constitutionality of a statute is a question of law. *See State v. McLellan*, 149 N.H. 237, 240 (2003). Thus, I will review *de novo* the trial court's determination as to the constitutionality of RSA 458:17, VI, and its application to this case. *See id.*

As a preliminary matter, I must determine whether the legislature intended that paragraph VI allow a grant of custody to a grandparent over a natural or adoptive parent of the child, who is not unfit and who poses no danger of harm to the child. The trial court held, and Father argues, that this was not the legislature's intent. I disagree.

Where the language of a statute is clear and unambiguous, we do not examine the legislative history. *Lamy v. N.H. Pub. Utils. Comm'n*, 152 N.H. 106, 108 (2005). The clear and unambiguous language of the statute states that, where the court determines that it is in the child's best interest, "[n]othing in [paragraph VI] shall be construed to prohibit or require an award of custody to a stepparent or grandparent." I see no way to read this phrase other than to permit the superior court authority to grant custody, in appropriate circumstances, to a stepparent or grandparent, even where the court may not have found the parent to be unfit. Father argues that the legislative history demonstrates that the legislature did not intend to *require* such a custody award. While such an award may not be required, the plain language permits it.

Having determined that the legislature intended to allow stepparents and grandparents to intervene and obtain custody in a dispute between natural or adoptive parents, I now examine whether the statute is constitutional. We are the final arbiter of legislative intent as expressed in

the words of the statute considered as a whole. *In the Matter of Watterworth & Watterworth*, 149 N.H. 442, 445 (2003). We presume that the legislature intended to confine a statute's scope within constitutional limits. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. 919, 922 (1982). Our goal is to apply statutes in light of the legislature's intent in enacting them and in keeping with the policies sought to be advanced by an entire statutory scheme. *Appeal of Manchester Transit Auth.*, 146 N.H. 454, 458 (2001). A statute will not be construed to be unconstitutional where it is susceptible to a construction rendering it constitutional. *White v. Lee*, 124 N.H. 69, 77-78 (1983).

Thus, I must determine whether granting joint legal custody and primary physical custody to a grandparent over the objection of an otherwise fit natural or adoptive parent violates that parent's fundamental rights. We have previously held that courts may grant legal and physical custody to an unrelated third party or the division for children, youth and families (DCYF), even to the exclusion of the natural or adoptive parents, where the parents have been held to be unfit. *See In re Bill F.*, 145 N.H. 267, 272-76 (2000); *In re Samantha L.*, 145 N.H. 408, 409, 412-13 (2000); *Robert H.*, 118 N.H. at 715-20; *Butler v. Butler*, 83 N.H. 413, 415 (1928). The question here, however, deals with a grant of primary physical custody to a grandparent and shared legal custody between the grandparent and a natural or adoptive parent absent a finding that the parent is unfit. While we have previously decided whether custody may be granted to a stepparent, *see, e.g., Stanley D.*, 124 N.H. 138, the case of a grandparent is one of first impression.

■ Because of the importance and fundamental nature of parental rights, I will apply strict scrutiny to examine the constitutionality of paragraph VI. Strict scrutiny is the correct standard to apply when determining the constitutionality of a statute that touches upon a fundamental right. *In re Sandra H.*, 150 N.H. 634, 638 (2004). As parental rights are fundamental and protected by due process, strict scrutiny should be applied when examining statutes dealing with these rights. *Robert H.*, 118 N.H. at 716. Under the State Constitution, this test requires that I determine if granting custody to a stepparent or grandparent is necessary to achieve a compelling State interest. *Sandra H.*, 150 N.H. at 638; *see also Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). Additionally, such a custody award must be neither unduly restrictive nor unreasonable. *Seabrook Police Assoc. v. Town of Seabrook*, 138 N.H. 177, 179 (1993). In this sense a strict scrutiny analysis under the State Constitution is much like the "narrowly tailored" analysis required under

the Federal Constitution. *See id.*; *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

We note that, generally, strict scrutiny need not be applied to custody disputes. This is because in most cases courts will be balancing the rights of two fit parents, both of whom have the same constitutional right to custody of their children. *See Nelson*, 149 N.H. at 548. Here, however, we have a grandparent intervening in order to secure custody of a child, thus requiring that I analyze RSA 458:17, VI under the higher standard.

■ The interest in a child's well being is not limited to the parents. We recently emphasized that the State has "a competing interest in the welfare of children within its jurisdiction." *In the Matter of Berg & Berg*, 152 N.H. 658, 661 (2005) (quotation omitted). In *Berg*, we noted that "parental rights are not absolute, but are subordinate to the State's *parens patriae* power, and must yield to the welfare of the child[, p]articularly in the context of divorce and custody litigation." *Id.* (citation and quotation omitted). Additionally, this interest has long been recognized by the United States Supreme Court. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979) (citing cases). Because the *parens patriae* power is one of the few ways that the State has to protect the interests of minor children, I hold that this power is not only a competing interest to parents' rights, but that in certain circumstances it qualifies as a compelling interest as well.

In so holding, I recognize that fit parents are presumed to act in the best interest of their children. *Nelson*, 149 N.H. at 547; *Troxel*, 530 U.S. at 68. "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603. It is because of this strong presumption in favor of fit natural or adoptive parents that I will uphold RSA 458:17, VI only if the statute withstands the heavy burden of strict scrutiny.

■ When it wrote paragraph VI, the legislature stated that "[t]he paramount and controlling consideration in deciding child custody is the overall welfare of the child." With this phrase, the legislature made clear that it was enforcing the State's compelling interest in protecting children. Thus, the clause in paragraph VI allowing the superior court to grant custody to grandparents and stepparents justifies intrusion into an otherwise fit parent's custodial rights only when doing so is neither unduly restrictive nor unreasonable, and when it is necessary to exercise the State's *parens patriae* power to protect the child. I first address the unreasonable or unduly restrictive inquiry, and then turn to whether the authority granted is necessary.

As to the nature of the restriction, I begin by noting that the statute here is much more limited in scope than that in *Troxel*. Paragraph VI allows a court to grant intervention by, and award custody to, only two classes of people—a child's stepparents and grandparents. RSA 458:17, VI. This limitation falls within our holding in *Nelson* where we refused to grant standing to an "unrelated third person." *Nelson*, 149 N.H. at 549. Additionally, stepparents and grandparents may only petition for custody by intervening in an already existing custody dispute incident to divorce or nullity, or as we have just held, in a custody dispute between unwed parents. *See* RSA 458:17, VI.

By contrast, the statute at issue in *Troxel* allowed *any* person to petition the court for visitation rights *at any time*. *Troxel*, 530 U.S. at 67. Justice O'Connor, writing for a four-justice plurality, described the statute as "breathtakingly broad." She continued, "That language effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id*. In this holding the plurality was joined by Justice Souter. However, because he agreed that the statute was unconstitutional on its face as it swept too broadly, Justice Souter would not have "consider[ed] the precise scope of the parent's right or its necessary protections," as did the plurality. *Id*. at 76-77.

Our holding in *Nelson* reflects this concern over the breadth of rules governing awards of custody—a broad rule allowing intervention by any third party in a custody dispute between natural or adoptive parents, even where strong psychological ties exist, does not leave sufficient protection of the parents' rights. *Nelson*, 149 N.H. at 548-49. There must be something more, such as a significant failure of a parent to accept parental responsibilities, thus leaving the child to be raised by the stepparent or grandparent in place of the parent as in *Diana P.* and *Quilloin*, or the marriage of the stepparent to one of the child's parents as in *Stanley D.*, *Bodwell* and *Quilloin*, to allow such intervention to occur. Paragraph VI does not even go so far as to allow termination of parental rights and thus permit adoption by a third party as in *Diana P.* and *Quilloin*, but only allows intervention in custody matters as in *Stanley D.* and *Bodwell*.

█ Accordingly, the degree to which an opposing parent may have failed in his or her parental responsibilities need not necessarily rise to the extreme level of unfitness for a determination that custodial rights should be granted jointly to the parent and a grandparent. In *Stanley D.*,

> the trial court did not terminate the natural mother's parental rights. Rather, the court awarded joint legal custody to both parties and physical custody to the stepfather. While recognizing

the importance of day-to-day custody in the spectrum of parental rights, we [did] not find that the denial of an award of physical custody is equivalent to the termination of parental rights, thereby requiring proof of the natural [or adoptive] parent's unfitness or other extraordinary circumstances.

*Stanley D.*, 124 N.H. at 142-43. *Compare id. with Santosky v. Kramer*, 455 U.S. 745, 752-70 (1982) (holding that due process requires that termination of parental rights proceedings be fundamentally fair and proved by at least clear and convincing evidence). While I now believe that some exceptional circumstances beyond a strong psychological relationship must be shown to justify a grant of custody to a grandparent, I continue to believe that, where parental rights have not been terminated, proof of unfitness is not required under Part I, Article 2 of the State Constitution. Paragraph VI, along with paragraphs III and IV, make clear the presumption that parents should retain joint legal custody as well as some physical custody rights even where custody is shared with a grandparent. *Compare Stanley D.*, 124 N.H. at 142-43, *with Bill F.*, 145 N.H. at 272-76, *and Samantha L.*, 145 N.H. at 409, 412-13.

Not only was the statute in *Troxel* exceedingly broad, but once a party had petitioned for visitation, "a parent's decision that visitation would not be in the child's best interest [was] accorded no deference." *Troxel*, 530 U.S. at 67. Paragraph II of RSA 458:17 states that "in the making of any order relative to such custody there shall be a presumption, affecting the burden of proof, that joint legal custody is in the best interest of minor children." The grandparent's visitation statute, RSA 458:17-d, also makes clear that parents' wishes and rights should be given deference by the court. That section states that courts must consider "[w]hether such visitation would interfere with any parent-child relationship or with a parent's authority over the child," as well as the "nature of the relationship between the grandparent and the parent of the minor child, including friction between [them], and the effect such friction would have on the child." RSA 458:17-d, II(b), II(d) (repealed Oct. 1, 2005).

■ Furthermore, when the legislature recently recodified RSA 458:17, VI as RSA 461-A:6, V, it added various factors that courts must consider in determining the best interest of the child. The final factor includes "[a]ny other additional factors the court deems relevant." RSA 461-A:6, I(l). Consistent with the decisions in *Nelson* and *Troxel*, I now hold that, in determining the best interest of the child, in cases arising under paragraph VI, it is not only relevant, but also necessary that a court give special consideration to the wishes of the child's parents. I believe that

such an interpretation is consistent with the entire statutory scheme. *See Manchester Transit Auth.*, 146 N.H. at 458.

The legislature has also made provision for the appointment of a guardian ad litem "to enable the court to make an informed decision." RSA 458:17-a, II. A guardian ad litem serves as an advocate of the child, but may be appointed on the court's own motion or that of any party. The appointment of a guardian ad litem is yet another safeguard for parents' rights and protection against arbitrary judicial determinations.

■ Finally, because of the deference granted to fit natural or adoptive parents under Part I, Article 2 of the State Constitution, as well as the Federal Constitution as interpreted in *Troxel*, I hold that the intervening party, as well as any parties supporting the intervenor, must prove by clear and convincing evidence that the stepparent or grandparent should obtain custody of a child. In *Troxel*, the Washington trial court "presumed the grandparents' request should be granted unless the children would be 'impact[ed] adversely.'" *Troxel*, 530 U.S. at 69 (alteration in original). By doing so, that judge placed the burden on the parent to disprove that visitation would be in the best interest of the children. *Id.*

■ I believe that RSA 458:17, VI, as interpreted here, coupled with the plain language of the statute allowing an award of custody to stepparents or grandparents, satisfies the requirements of the State Constitution that it be neither unduly restrictive nor unreasonable. *See Seabrook Police*, 138 N.H. at 179. I additionally hold that, so construed, the statute is sufficiently narrowly-tailored, thus passing this prong of strict scrutiny under the Federal Constitution. *See id.*; *Troxel*, 530 U.S. at 67-69; *Glucksberg*, 521 U.S. at 721.

We now determine if the provision allowing a grant of custody to stepparents or grandparents is necessary to achieve the State's compelling interest in protecting the welfare of children within its jurisdiction. The legislature has given no guidance, beyond stating that it must be in the child's best interest, as to when it is necessary that a court grant custody to a stepparent or grandparent. Thus, it falls to us to determine whether the statute is susceptible to a construction that is constitutional. *White*, 124 N.H. at 77-78.

A controlling factor allowing petitions by third parties in *Diana P.*, *Bodwell* and *Stanley D.* was the nature of the relationship between them and the child. Those cases make clear that the best interest of the child should take into account the child's relationships with others, not merely the biological or legal connection the child has, or does not have, with the third party. We have recognized the importance of this distinction in other cases as well. "We believe that familial relationships, aside from biological

bonds, stem 'from the emotional attachments that derive from the intimacy of daily association,' and from the manner in which such relationships promote family life." *In re Shelby R.*, 148 N.H. 237, 239 (2002) (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983)).

The United States Supreme Court has additionally recognized the importance that psychological connections can have, even over biological ones. "[T]he existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child." *Lehr*, 463 U.S. at 266-67; *see also Quilloin*, 434 U.S. at 256. Additionally, "'[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.'" *Lehr*, 463 U.S. at 260 (quoting *Caban*, 441 U.S. at 397 (Stewart, J., dissenting)).

Accordingly, to grant custody to a stepparent or a grandparent as a means to protect the child, it is necessary that there be a substantial psychological parent-child relationship between the child and the stepparent or grandparent, such that denial of custody to that person would "be emotionally harmful to the child." *Diana P.*, 120 N.H. at 797. While the *amicus* urges that we adopt the rigid four-part test from *H.S.H.-K.*, 533 N.W.2d at 421, I decline the invitation. Inflexible rules are inconsistent with the application of a best interest analysis and "the legislative efforts at striking a balance in this delicate and difficult area of human relationships." *Diana P.*, 120 N.H. at 797; *see also* RSA 461-A:6, I(l). However, I acknowledge that the factors mentioned in that test are very similar to those we have previously considered and may be instructive as courts determine whether granting custody to a stepparent or grandparent is necessary for the State to protect a child from harm. *See also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS §§ 2.01 to .04, 2:18 (2002). This said, I do recognize the right of the legislature to establish its own guidelines in this area, should it choose to do so.

I also note that, contrary to the arguments of the *amicus*, daily care and nurturing of children that fosters development of an emotional parent-child bond is not deserving of full constitutional protection. That is, the relationship does not give rise to an enforceable constitutional right in the stepparent or grandparent. Rather the substantial nature of the relationship may make it necessary for the State, in the exercise of its *parens patriae* responsibilities, to allow intervention and possibly a grant of custody to a stepparent or grandparent in a custody dispute between natural or adoptive parents.

■ Thus, I hold that an award of custody to a stepparent or a grandparent over the objection of a fit natural or adoptive parent is not unreasonable or unduly restrictive of parental rights only if the petitioning party can show by clear and convincing evidence that: (1) the custody award would specifically be in the child's best interest because of a significant psychological parent-child relationship; (2) the custody award only be allowed where the family is already in the process of dissolution; and (3) there is some additional overriding factor justifying intrusion into the parent's rights, such as a significant failure by the opposing parent to accept parental responsibilities. Additionally, I hold that the custody award must be necessary for the State to enforce its compelling interest in protecting the child from the emotional harm that would result if the child were forced to leave the significant psychological parent-child relationship between the child and the stepparent or grandparent.

I note that this holding goes further in protecting the rights of parents than have other courts addressing this issue, both before and after *Troxel.* The Maine Supreme Judicial Court and Ohio Supreme Court, for example, both upheld their States' grandparent visitation statutes under strict scrutiny and in light of *Troxel. Rideout v. Riendeau,* 761 A.2d 291 (Me. 2000); *Harrold v. Collier,* 836 N.E.2d 1165 (Ohio 2005). The Maine court held that the State has a compelling governmental interest "in providing a forum within which grandparents who have acted as parents to their grandchild may seek continued contact with that child," *Rideout,* 761 A.2d at 294, but did not require that grandparents prove that failure to grant visitation would be necessary to prevent harm to the child, *id.* at 304, 313 (Wathen, C.J., concurring). The Ohio Supreme Court similarly held that the State always has a compelling interest in protecting a child's best interest. *Harrold,* 836 N.E.2d at 1172. Additionally, the Ohio court only discussed procedural protections for the parents, *id.* at 1171-73, and did not require proof of the kinds of substantive issues that a stepparent or grandparent must demonstrate in order to succeed under RSA 458:17, VI.

My holding also provides more protections for parents than did the New Jersey Supreme Court in *V.C. v. M.J.B.,* 748 A.2d 539 (N.J.), *cert. denied,* 531 U.S. 926 (2000). There, an unmarried woman had been raising two children as their mother. At the time, she was also living with the children and their biological parent while the two were in a romantic relationship. The New Jersey court held that the woman's claim to be a psychological parent to the children raised sufficient "exceptional circumstances" to allow the woman to petition for custody and visitation of the children. *Id.* at 550. The New Jersey Supreme Court did not require any showing of harm to the children, nor did it require proof of abandonment by or marriage to the biological parent. Furthermore, that court stated that a psychological

parent "stands in parity with the legal parent" and that "[c]ustody and visitation issues between them are to be determined on a best interests standard." *Id.* at 554. As I have noted, nothing here gives psychological parents the kinds of rights extended by the New Jersey Supreme Court.

Although it did not apply strict scrutiny, my holding today is much like that of the Massachusetts Supreme Judicial Court. In *Youmans v. Ramos*, 711 N.E.2d 165 (Mass. 1999), that court held that a girl's aunt, who had raised her as her daughter after the mother's death, was entitled to visitation after the girl's father returned and claimed custody over her. The court stated:

> His long acquiescence in his daughter's living with her aunt led to the development of the child's close bond with her aunt. It is not the aunt's interests that the visitation order protects, but [the girl's] interests. The child is the one who is at risk of emotional damage because of her father's belated claim of custody. The aunt has fulfilled a role that the father chose not to assume.

*Id.* at 174. I see no reason why the New Hampshire or Federal Constitutions would prohibit a similar result.

The dissent, like the trial court here and that in *Harrold, see Harrold*, 836 N.E.2d at 1172-73, treats the presumption of fitness described in *Troxel* as if it were irrefutable. Doing so goes against the procedures set forth by both this court and the United States Supreme Court for analyzing fundamental rights. A determination that an individual has a fundamental right does not foreclose the State from ever limiting it. Rather, such a determination then requires that there be an analysis into whether there exists any narrowly tailored set of circumstances under which intrusion into the individual's right is necessary to further a compelling state interest. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306 (2003) (holding that racial diversity is compelling state interest sufficient to justify limited discrimination in college admissions).

I am cognizant of the fact that there may be some situations under which it would not be constitutional to grant custody to a stepparent or grandparent. However, I can foresee situations in which doing so would not be unconstitutional, even if the opposing parent has not so neglected or abandoned the child as to have his or her rights terminated—*i.e.*, to be declared unfit. Accordingly, because there are some cases in which its application would be constitutional, I refuse to invalidate RSA 458:17, VI on its face. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (for statute to be held unconstitutional on its face, "challenger must establish that no set of circumstances exists under which the Act would be valid"). While I recognize that granting custody to a stepparent or grandparent

over the objection of a fit natural parent will be, and ought to be, rare, I can envision situations where it would be justified. The strict scrutiny analysis here provides the framework for establishing the limited circumstances when such a custody award may occur.

Additionally, the dissent misconstrues the compelling interest analysis. I agree that the State's *parens patriae* power will generally not give it a compelling reason to inject itself into family affairs. Indeed, I have distinguished the holding here from those of the Maine Supreme Judicial Court in *Rideout* and the Ohio Supreme Court in *Harrold*. On the rare occasions where the State's failure to involve itself would lead to a child being harmed, it may be necessary that the State become involved in an existing custody dispute between two otherwise fit natural or adoptive parents.

I agree with the dissent that "there will *normally* be no reason for the State to inject itself into the *private realm of the family* to further question the ability of [a] parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69 (plurality opinion) (emphasis added). In *Preston v. Mercieri*, 133 N.H. 36 (1990), we noted that the State may "intervene in the family milieu if a child's welfare is at stake. . . . Because the common law presumption against intervention was premised upon the tradition of nuclear family autonomy, State intervention turned, historically, on whether or not the parents were unfit, *see [Quilloin*, 434 U.S. at 248], *or* the family was 'intact.'" *Preston*, 133 N.H. at 40-41 (emphasis added).

My holding here recognizes that a child may be harmed, not only by being placed or remaining with an unfit parent, but also by being removed from a stepparent or grandparent with whom, because of the dissolution of the nuclear family, the child has acquired a significant parent-child relationship. I recognize that "[t]he best interests of the child is . . . not an absolute and exclusive constitutional criterion for the government's exercise of the custodial responsibilities that it undertakes." *Reno v. Flores*, 507 U.S. 292, 304 (1993) (quotation omitted). Indeed, I agree that an award of custody to a stepparent or grandparent over the objection of a fit natural or adoptive parent would not be constitutional if it were simply based on a finding that the stepparent or grandparent "would *best* provide for the child's welfare." *Id.*

The dissent fails to acknowledge that the *Troxel* plurality expressly decided that it would not

> consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing

of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context.

*Troxel,* 530 U.S. at 73 (plurality opinion). Having done so myself, I hold that there are circumstances in which not only visitation, but also custody, may be awarded to a stepparent or a grandparent. Nor does the dissent explain how *Quilloin*—a case that the *Troxel* plurality and Justice Souter's concurring opinions expressly relied upon, *Troxel,* 530 U.S. at 66, 77— would not allow an award of custody under paragraph VI. Indeed, the implication of the dissent's position is that, unless custody or visitation has been granted to another *fit* parent, it can never be granted to *anyone* as long as a fit parent objects.

Finally, I address the dissent's contention that the holding here adds language that the legislature did not see fit to incorporate in RSA 458:17, VI. Paragraph VI contains no standards by which a trial court should determine whether custody ought to be granted to a stepparent or grandparent. It is within our purview to establish the constitutional grounds within which a statute may be applied. *See Appeal of Public Serv. Co.,* 122 N.H. at 922; *White,* 124 N.H. at 77-78. Articulating the proper burden of proof is not unprecedented in our case law. For example, in *Robert H.,* we held that in order to terminate parental rights, there must be a showing beyond a reasonable doubt. *Robert H.,* 118 N.H. at 716-17. Requiring a showing of clear and convincing evidence for RSA 458:17, VI is within our procedures here as it was in *Robert H.*

Accordingly, I hold that RSA 458:17, VI survives the facial challenge of strict scrutiny under both the State and Federal Constitutions, and may thus be applied in this case. *See Nelson,* 149 N.H. at 547; *Seabrook Police,* 138 N.H. at 179; *Troxel,* 530 U.S. at 66-68, 77-78; *Glucksberg,* 521 U.S. at 721.

## V

Having held that RSA 458:17, VI is facially valid, I now turn to whether applying this statute to the custody dispute between Mother and Father is constitutional. Although the trial court did not apply the statute, some of its factual findings, as well as the procedural steps it took, will obviate the need for a complete relitigation of the issues. Accordingly, I dispose of some issues here and leave others for a determination on remand.

In order for it to be constitutional to award Grandmother custody of Daughter, I must first examine whether there were sufficient procedural safeguards to protect Mother's and Father's parental rights. The record

demonstrates that the court gave sufficient deference to the wishes of Mother and Father when making the custody determination. It allowed them both multiple opportunities to be heard, and appointed the GAL as a neutral party to help make its ruling on that issue and that of custody. Father apparently believed that the GAL failed in her responsibilities to remain neutral, but the trial court disagreed. Because Father did not ask the trial court to reconsider this finding, nor has he asked us on appeal to review the actions of the GAL, I see no reason why the trial court should not consider the GAL report on remand.

Indeed, the recommendation of the GAL—Daughter's State-appointed representative—is uniquely important to whether custody should be granted to Grandmother. In this case, the GAL not only assented to Grandmother's intervention, but she also recommended that the court implement a plan very similar to Mother's proposed custody arrangement—an award of joint legal custody to Mother, Father and Grandmother, with primary physical custody of Daughter being awarded to Grandmother and visitation rights to Mother and Father. As noted above, nothing about Grandmother's parent-child relationship with Daughter gives Grandmother a constitutional right to intervene or to be awarded legal or physical custody of Daughter. Rather, the interest protected by paragraph VI is that of the State to protect the well-being of children within its jurisdiction. The GAL supported Grandmother's petition, and I will allow it to go forward.

I also consider the wishes of Mother, and not simply those of Father, as important to my decision. In this case, not only did the GAL urge granting joint custody to Father and Grandmother, but Mother did so herself. Although the trial court found that she was unfit to exercise primary physical custody of Daughter, this does not mean that she should have no say whatsoever in the placement of her child. In this sense, Mother's request is not unlike the participation of a parent in the creation of a consent decree between parents and DCYF when the parent has been accused of abuse and neglect. *See Bill F.*, 145 N.H. at 269; RSA 169-C:17 (Supp. 2005). I cannot ignore Mother's request that Daughter be placed with Grandmother in her home any more than I can ignore Father's request that she be placed in his.

Finally, while the trial court did place the burden of proving that Grandmother should be granted custody jointly with Father upon Mother and Grandmother, it is unclear what standard the court applied. Because of the deference granted to fit natural or adoptive parents both under Part I, Article 2 of the State Constitution and the Federal Constitution as interpreted in *Troxel*, we order the trial court to apply a clear and convincing standard on remand.

To the extent that these procedural safeguards were applied, I affirm the proceedings below. However, this does not end the analysis. The court acted on the presumption that Father, as Daughter's biological father, would act in her best interest. Where it failed, however, was in the conclusion that this was an irrefutable presumption that would *necessarily* lead to Daughter's being placed in his home, and that RSA 458:17, VI should thus be held unconstitutional. Although parents have significant rights under both the State and Federal Constitutions, *see Nelson* 149 N.H. at 547-49; *Troxel*, 530 U.S. at 66-67, the application of strict scrutiny shows that there are some limited circumstances when the State's compelling interest may supersede those rights. As interpreted here, paragraph VI defines the very narrow situations in which such an award would be necessary to further the State's compelling interest, and Grandmother's relationship with Daughter may qualify as one of those.

For Grandmother to have been awarded custody jointly with Father, she and Mother would have had to prevail additionally on various substantive issues: (1) whether Grandmother and Daughter had a substantial parent-child relationship; (2) that failure to award custody to Grandmother would be emotionally harmful to Daughter; and (3) that there was some additional factor justifying intrusion into Father's parental rights. Accordingly, I address whether there is sufficient evidence in the record such that, by applying RSA 458:17, VI, the trial court may award Grandmother custody jointly with Father.

As part of the final decree, the court adopted findings of fact proposed by each of the parties. I have previously noted that Father does not challenge whether it is in Daughter's best interest to remain in Grandmother's custody. However, it is unclear whether the parent-child relationship between Daughter and Grandmother rises to a level sufficient to make it necessary that the State enforce its compelling interest in protecting Daughter's well being, thus allowing Grandmother to intervene and obtain custody. To prevail, Grandmother must show that the parent-child relationship is so significant that Daughter would be emotionally harmed if custody were not granted to Grandmother. From Mother's and Grandmother's proposed findings of fact and rulings of law, many of which were adopted by the trial court, it appears that Grandmother had a very significant role in Daughter's life. Not only has Daughter lived in Goshen her entire life, but much of that has been in Grandmother's home. In particular, the court adopted two of Grandmother's findings that stated:

> In the past two years, [Grandmother] has been predominately responsible for the raising of [Daughter]—feeding her, clothing her, bathing her, tucking her into bed at night, and taking care of

> her daily needs. . . . Throughout [Daughter's] life, [Grandmother] has played the parental role; particularly in the last two years, [Grandmother] has been the main parental figure in [Daughter's] life.

Additionally, the court adopted the conclusions that it is in Daughter's best interest "to maintain the strong bond she has with her grandmother," and "to remain with her maternal grandmother in Goshen, . . . the home she has known for the majority of her life."

While the court neither specifically adopted nor rejected the recommendations of the GAL, those recommendations are also instructive given the GAL's role as Daughter's court-appointed representative. The GAL stated:

> It is the Guardian ad Litem's belief that [Daughter] will benefit from maintaining the positive and nurturing relationship she enjoys with her grandmother and other members of her mother's family, with her school and her community, where she has lived all of her life, and where she is known and loved. She would surely suffer irreparable harm were she to be removed from her grandmother's care and from her home and community. The loss of security [Daughter] would experience would be immeasurable, were she to be required to leave behind the safety of her home and her community to live with her father . . . .

These are in stark contrast to many of Father's proposed findings of fact, which the trial court also adopted. These findings suggest that Mother was the one who cared for Daughter, with Grandmother acting only as a "secondary babysitter." Father never proposed that it was in Daughter's best interest that custody be granted to him, although the court did adopt his proposed factual findings that "[d]uring visitation, [Father] provides [Daughter] with a stable two-parent household," and that Daughter "has a loving relationship" with Father.

The record is similarly unclear as to whether it supports a finding that there are additional factors present in this case justifying some intrusion into Father's rights. Again, the court adopted various of Mother's proposed findings of fact, which suggest that Father avoided paternity testing, and only consented to the test and began participating in Daughter's life at the urging of his wife. Mother proposed that Father, after finally determining that he was Daughter's father, "had varying degrees of visitation with his daughter. He has participated in some visits—but not participated in a substantial amount of visitation that was available to him." The GAL, in recommending that primary physical

custody be given to Grandmother, stated that Father "sees [Daughter] as damaged and in need of repair," and that they have "a relationship which is tenuous and unhealthy at best."

Father's proposed findings, also adopted by the court, paint a picture of a man who was always willing to participate in Daughter's life, had he simply been given proper notification about his relationship to her. For example, Father states that "[i]t is unclear whether a scheduled 1995 paternity test was not conducted because [Father] did not receive the notice or because the testing location was changed at the last moment." Other of his adopted findings state that between August 2002 and 2004, Mother and Grandmother contacted him very infrequently and did not notify him of any school meetings, school activities, extra-curricular activities, selection of doctors, doctors' names or doctors' appointments. As seen in *Brauch*, a proper determination on this issue is critical to resolving this case.

Because of the contradictory nature of the trial court's findings of fact, I am unable to complete an analysis of whether awarding custody to Grandmother would have been unconstitutional. Accordingly, to the extent that the findings of fact are inconsistent with each other and with the terms of the final decree, I vacate it and remand for the trial court to determine: (1) whether Grandmother's parent-child relationship with Daughter is so significant that a change in custody would emotionally harm Daughter, *see Diana P.*, 120 N.H. at 797; and (2) whether Father significantly failed to accept his parental responsibilities, thus leaving Daughter to be raised by Grandmother as well as Mother, *see Stanley D.*, 124 N.H. at 142-43; *Brauch*, 121 N.H. at 570; *Quilloin*, 434 U.S. at 249-50.

> *Affirmed in part; vacated in part; and remanded.*

NADEAU and GALWAY, JJ., concurred in part and dissented in part; DALIANIS and DUGGAN, JJ., dissented.

NADEAU and GALWAY, JJ., concurring in part and dissenting in part. While we agree with Chief Justice Broderick's result and his conclusion that RSA 458:17, VI (2004) (repealed Oct. 1, 2005), is constitutional on its face, we respectfully disagree with his newly adopted test concerning the application of RSA 458:17, VI in custody disputes between a fit biological or adoptive parent and a grandparent or stepparent with *in loco parentis* status.

The right of biological and adoptive parents to make decisions regarding the care, custody and control of their children is a fundamental liberty interest protected by both the State and Federal Constitutions. *In the*

*Matter of Nelson & Horsley*, 149 N.H. 545, 547 (2003); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). However, the State has a competing interest in the welfare of children within its jurisdiction and may exercise its *parens patriae* power to intervene if a child's welfare is at stake. *Preston v. Mercieri*, 133 N.H. 36, 40 (1990). Accordingly, "parental rights are not absolute, but are subordinate to the State's *parens patriae* power, and *must* yield to the welfare of the child." *Id.* (emphasis added). The best interests of the child guide *all* custody matters in New Hampshire. *See Bodwell v. Brooks*, 141 N.H. 508, 512 (1996). Therefore, we must consider the constitutionality of RSA 458:17, VI in the context of these competing interests.

In *Troxel*, the United States Supreme Court held that a Washington statute, granting "any person" standing to petition the court for visitation "at any time" and giving the court authority to grant visitation whenever it "may serve the best interest of the child," was unconstitutional and "breathtakingly broad." *Troxel*, 530 U.S. at 67. While acknowledging the presumption that fit parents act in the best interests of their children, the court stated that "[t]he problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to [the biological mother's] determination of her daughters' best interests." *Id.* at 69. The Court reasoned that "if a fit parent's decision [concerning visitation] becomes subject to judicial review, the court *must* accord at least some special weight to the parent's own determination." *Id.* at 70 (emphasis added). The court specifically declined to consider "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Id.* at 73. Thus, *Troxel* does not preclude the court from exercising its *parens patriae* power in a custody dispute involving a fit parent and a third party so long as, in doing so, it grants some deference to a fit parent's fundamental liberty interest in the care, custody and control of the child.

We agree that RSA 458:17, VI is constitutional on its face because it is narrowly tailored, identifying only two classes of third parties who have standing to be considered in a custody dispute; namely, grandparents and stepparents. Unlike the "breathtakingly broad" Washington statute at issue in *Troxel*, RSA 458:17, VI, on its face, limits the third parties who may be considered in a custody dispute, thereby protecting the biological or adoptive parent's constitutional rights. We have previously recognized that a denial of an award of physical custody is not equivalent to the termination of parental rights, and, therefore, does not require proof of the natural parent's unfitness. *See Stanley D. v. Deborah D.*, 124 N.H. 138, 142-43 (1983) (awarding joint legal custody and sole physical custody to the

stepfather instead of the natural mother); *Bodwell*, 141 N.H. at 514 (holding that an *in loco parentis* stepfather can be a party to a custody proceeding between unwed biological parents). Given that we believe that *Troxel* does not mandate a finding of parental unfitness before a court may award visitation to a grandparent or stepparent, we conclude Chief Justice Broderick's determination, that RSA 458:17, VI is constitutional on its face, is consistent with both our State jurisprudence and *Troxel*.

Having concluded that RSA 458:17, VI is facially constitutional under *Troxel*, the chief justice next considers whether RSA 458:17, VI can be constitutionally applied to the custody dispute at issue. Because this dispute involves a fit biological parent (the father) and a related third party (the grandmother) and involves important and fundamental parental rights, the chief justice correctly applied a strict scrutiny analysis. We agree that additional procedural and substantive safeguards should be adopted and implemented in order to protect the biological parents' rights when RSA 458:17, VI is applied in custody disputes between such parents and one of the two statutorily enumerated third parties with standing to intervene. However, we would adopt a less stringent standard than that proposed by the chief justice.

His test subordinates the best interests of the child to the fundamental liberty interests of the fit parent. We believe that this is erroneous. *See Preston*, 133 N.H. at 40. The time has come for courts to stop treating children as the chattel of their parents. In child custody disputes, the best interests of the child must be paramount. *See id.*

Accordingly, when applying RSA 458:17, VI (or, its successor, RSA 461-A:6 (Supp. 2005)), to determine a custody dispute between a fit biological or adoptive parent and a grandparent or stepparent, we would require the grandparent or stepparent to prove by clear and convincing evidence that: (1) based on the totality of the facts and circumstances of the case, he or she has established an *in loco parentis* relationship with the child; (2) the denial of custody to the grandparent or stepparent would cause significant emotional harm to the child; and (3) it is in the best interests of the child to award custody to the grandparent or stepparent. We believe these requirements provide the extra procedural and substantive protections that accord presumptive validity to the biological or adoptive parents' interests and strike the proper balance between protecting those fundamental liberty interests and upholding the State's *parens patriae* power to protect the best interests of the child.

The chief justice would also require the intervening third party to prove the existence of an additional factor, such as that the biological parent has significantly failed to accept his or her parental responsibilities. Since fit parents are presumed to act in the best interests of their children, *see*

*Nelson*, 149 N.H. at 547; *Troxel*, 530 U.S. at 68-69, a parent who significantly fails to accept his or her parental responsibilities is arguably unfit. Thus, imposing this additional factor sets the bar so high, particularly when the third party is a grandparent, that it is virtually indistinguishable from many of the extra protections required in abuse and neglect and termination of parental rights cases. To require proof of this additional factor would unreasonably restrict the court's ability to exercise its *parens patriae* power and protect the best interests of the child— particularly in cases involving a grandparent.

This application of RSA 458:17, VI is consistent with the additional protections required under *Troxel* and the present state of our jurisprudence governing custody issues. To hold otherwise, would require that a child raised for years by a grandparent or stepparent would always be given to a fit biological or adoptive parent without considering the best interests of the child.

We have declined to find that a denial of physical custody is equivalent to the termination of parental rights. *Stanley D.*, 124 N.H. at 142-43. We have also declined to grant custodial rights to a third party who was not statutorily identified in RSA 458:17, VI but had established an *in loco parentis* relationship with the child. *Nelson*, 149 N.H. at 549 (custody dispute between the biological mother and an unrelated third party with whom she had been in a long-term relationship and who had established *in loco parentis* status). In the context of a custody determination, the emotional ties that exist between a third party, who is not a grandparent or stepparent as protected by statute but has attained *in loco parentis* status, and the child are important. However, we need not address the applicability of this test to such third parties because that issue is not before us.

While the dissent interprets *Troxel* to create a bright-line rule, which may be easily applied, we believe its interpretation is overly broad and fails to protect adequately the State's *parens patriae* power, and by extension the best interests of the child, which is the fundamental principle guiding all custody matters. *Bodwell*, 141 N.H. at 512. By contrast, our test preserves the biological and adoptive parents' fundamental liberty interests, while not unreasonably restricting the court's ability to exercise its *parens patriae* power to protect the best interests of the child.

Therefore, consistent with the foregoing, we would reverse and remand this case for a determination of custody consistent with the procedural and substantive protections encompassed in our proposed test.

DALIANIS and DUGGAN, JJ., dissenting. Because we agree with the superior court that RSA 458:17, VI (2004) (repealed Oct. 1, 2005) is

unconstitutional on its face in the wake of *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion), we respectfully dissent.

As the chief justice notes in his opinion, *Troxel* recognized that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children." *Troxel*, 530 U.S. at 66. We have long recognized a corollary right under Part I, Article 2 of the New Hampshire Constitution. *See In the Matter of Nelson & Horsley*, 149 N.H. 545, 547 (2003). In *Troxel*, the United States Supreme Court examined a Washington non-parental visitation statute and concluded that, as applied to the parent in that case, it unconstitutionally infringed upon that fundamental parental right. The court explained:

> [T]he Washington statute places the best-interest determination solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect . . . a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation . . . based solely on the judge's determination of the child's best interests.

*Troxel*, 530 U.S. at 67. The court concluded that a State will normally have no reason to interfere with a parent's ability to make the best child-rearing decisions where that parent is deemed fit. *Id.* at 68-69.

We have recognized a meaningful difference between awards of visitation and awards of custody, and have noted that granting visitation is a far lesser intrusion into parental rights than an award of custody. *In the Matter of Kosek & Kosek*, 151 N.H. 722, 725 (2005); *see Nelson*, 149 N.H. at 548; *Roberts v. Ward*, 126 N.H. 388, 393 (1985). Thus, we consider it logical to extend the rationale underlying *Troxel*, which considered the constitutionality of a non-parental visitation statute, to our examination of RSA 458:17, VI, which permits an award of non-parental physical custody.

While RSA 458:17, VI is not as "breathtakingly broad" as the statute examined in *Troxel*, *see Troxel*, 530 U.S. at 67, we believe that it is, nonetheless, unconstitutionally broad under the United States and New Hampshire Constitutions. As written, RSA 458:17, VI permits a court to award custody to a stepparent or grandparent "if the court determines that such an award is in the best interests of the child." RSA 458:17, VI. Much like the Washington non-parental visitation statute, it places the "best interest" determination solely in the hands of the court, regardless of a biological parent's fitness. We disagree with the chief justice's conclusion that RSA 458:17, II (2004) (repealed Oct. 1, 2005), which presumes that *joint legal custody* is in the best interest of minor children, and RSA

458:17-d (2004) (repealed Oct. 1, 2005), which accords deference to a parent's wishes when determining grandparent *visitation* rights, somehow cure this defect regarding *physical custody*.

We do not contest the court's assertion that the State has a competing interest in the welfare of children within its jurisdiction as embodied by its *parens patriae* power. We are unconvinced, however, that, under the "certain circumstances" identified by the chief justice, it qualifies as a compelling state interest that acts as a *de facto* counterweight to a fit biological parent's fundamental liberty interest in the care, custody or control of his or her children. We have noted that parental rights are "not absolute, but are subordinate to the State's parens patriae power, and must yield to the welfare of the child." *In the Matter of Berg & Berg*, 152 N.H. 658, 661 (2005). However, we are typically careful to permit the exercise of that power only in cases contemplating lesser intrusions into a parent's fundamental rights. *See id.* (superior court has authority to determine whether it is in the best interests of a child involved in a custody dispute to have confidential and privileged therapy records revealed to his or her parents); *Roberts*, 126 N.H. at 392 (superior court may utilize its *parens patriae* power to permit grandparental visitation when it is in the best interests of the child and RSA 458:17, VI does not apply). *But see Bodwell v. Brooks*, 141 N.H. 508 (1996) (in custody proceeding between unwed natural parents, superior court may use its *parens patriae* power to decide whether best interests of the child warrants intervention of stepparent as appropriate party).

As we noted previously, we have been careful to distinguish such lesser intrusions into fundamental parental rights from an award of custody, and we believe that the court now extends the State's *parens patriae* power in a way that erases that distinction. There is a presumption that fit parents act in the best interests of their children. *Nelson*, 149 N.H. at 547; *Troxel*, 530 U.S. at 68-69. We note that this presumption of fitness is not irrefutable, and that there exists in New Hampshire a statutory framework enabling the State to intervene in the family milieu and reassign custody when a child's welfare is at stake. *See generally* RSA ch. 169-C (2002 & Supp. 2005) (Child Protection Act); RSA ch. 169-D (2002 & Supp. 2005) (Children In Need of Services); RSA ch. 170-C (2002 & Supp. 2005) (Termination of Parental Rights). By reading RSA 458:17, VI to justify intrusion into an otherwise fit parent's custodial rights as an exercise of the State's *parens patriae* power to "protect the best interest of the child," the court wrests the presumed ability to act in the best interests of a child from a fit parent and shifts it to the trial judge. This is the very sort of interference deemed to be an unconstitutional intrusion into fundamental parental rights by *Troxel. Troxel*, 530 U.S. at 67-68.

The court concludes that RSA 458:17, VI is neither unduly restrictive nor unreasonable, and that it is sufficiently narrowly tailored so as to pass muster under a strict scrutiny analysis. In reaching this conclusion, the chief justice holds that, in determining the best interest of the child under RSA 458:17, VI, a court must give special consideration to the wishes of a child's parents. He further holds that an intervening party must show, by clear and convincing evidence, that: (1) a custody award is in the child's best interest because of a significant psychological parent-child relationship; (2) that the family unit is in the process of dissolution; and (3) there is some additional overriding factor justifying intrusion into the parent's rights, "such as a significant failure by the opposing parent to accept parental responsibilities."

We find no such requirements in the language of RSA 458:17, VI or RSA 458:17 as a whole. It is axiomatic that, when the language of a statute is plain and ambiguous, we will not consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *See, e.g., Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005). Though the chief justice believes that the language of RSA 458:17, VI is clear and unambiguous, we believe that he ascribes additional narrowing language to RSA 458:17 that the legislature did not see fit to incorporate.

Moreover, a test requiring courts to give "special consideration" to the wishes of a child's parents is inherently subjective and unworkable. Such a test will result in trial judges micromanaging custody determinations using criteria that necessarily reflect their personal predilections and biases. If applied on a case-by-case basis, the "special consideration" test proposed by the chief justice will create a morass of inconsistency in the State's trial courts.

The chief justice notes that a child may be harmed if removed from a stepparent or grandparent with whom the child has established a significant parent-child relationship "because of the dissolution of the nuclear family." This may undoubtedly be true in some cases. However, this recognition does little to remedy the fact that, as written, RSA 458:17, VI places the right to determine a child's "best interest" solely in the hands of the court, regardless of a biological parent's fitness. For the reasons outlined above, we believe this to be an unconstitutional infringement upon a fit biological parent's fundamental rights. We would leave it to the legislature to prescribe a remedy for the problem introduced by the chief justice.

We conclude by reiterating the majority position in *Nelson*, where we stated:

> [The] application of the best interests of the child standard in a custody dispute between a natural ... parent and a nonparent would offend due process if the parent's conduct towards the child has not been inconsistent with the parent's constitutionally protected status.

*Nelson*, 149 N.H. at 548. Addressing the specific facts of that case, we held that it would violate a fit natural parent's State constitutional rights to grant custodial rights to an unrelated third person over the express objection of that parent. *Id.* at 549. We recognized, however, that our decision in *Bodwell*, 141 N.H. at 514, carved out a limited exception to this rule for stepparents. *Nelson*, 149 N.H. at 549; *see also Stanley D. v. Deborah D.*, 124 N.H. 138, 143 (1983). Consistent with our reasoning above, we would overrule *Bodwell* and *Stanley D.* in light of the United States Supreme Court's decision in *Troxel.*

For these reasons, we would affirm the final decree of the superior court. Accordingly, we respectfully dissent.